2000 ND 123

**Thomas HOFFNER, Claimant and Appellant,**

v.

**NORTH DAKOTA WORKERS COMPENSATION BUREAU,** Appellee,

and

**North Central Construction, Inc., Respondent.**

No. 990366.

Supreme Court of North Dakota.

June 14, 2000.

Tami L. Norgard (argued) and Kermit E. Bye, Vogel, Weir, Hunke & McCormick, Ltd., Fargo, for claimant and appellant.

Leo F.J. Wilking, Special Assistant Attorney General, Fargo, for appellee.

VANDE WALLE, Chief Justice.

[¶ 1] Thomas Hoffner appealed from the North Dakota Workers Compensation Bureau's order denying his claim for benefits and from a judgment of the district court which affirmed the Bureau's decision. We affirm.

[¶ 2] In early Spring 1998, Hoffner, who lived in Fargo, approached one of his past supervisors, Wade Wolf, about getting a construction job with North Central Construction Company, Inc. ("North Central"). Wolf was the steel erection superintendent for North Central. Wolf and Hoffner were from the same town and Wolf had employed Hoffner on at least two prior occasions. North Central hired Hoffner as a worker/helper on three construction sites in East Grand Forks, Minnesota, where North Central had steel erection contracts for the repair of three separate school buildings that had been extensively damaged in the April 1997 flood.

[¶ 3] Because Hoffner did not have a driver's license, he rode from Fargo to East Grand Forks with either Wolf or with his roommate Corey Olson, who was already working for North Central in East Grand Forks. Hoffner, whose shifts ran from 7 a.m. to 5:30 p.m., began working at the East Grand Forks job site on April 10. On his eleventh day on the job, April 20, 1998, Hoffner was injured in an accident on the way to work. Shortly after 7 a.m., Olson's pickup, in which Hoffner was a passenger, collided with another vehicle at the intersection of U.S. Highway 2 and Columbia Road in Grand Forks, North Dakota.

[¶ 4] Hoffner and the two other North Central employees involved in the crash arrived at the job site at approximately 8:00 a.m. Hoffner worked at the job site for a few hours, but sometime around noon, he decided to seek medical attention because he was not feeling well. Hoffner went to the Emergency room and after being examined for the injuries he sustained, was released that evening. Hoffner did not work for North Central thereafter.

[¶ 5] Hoffner applied for Workers Compensation benefits. The Administrative Law Judge ("ALJ") concluded Hoffner's injuries were not compensable, because the injuries arose out of travel to work. The Bureau adopted the ALJ's order and the district court affirmed.

I

[¶ 6] On appeal, this Court reviews the Bureau's decision, not the district court's decision. *Loberg v. N.D. Workers Comp. Bur.*, 1998 ND 64, ¶ 5, 575 N.W.2d 221. We affirm the Bureau's decision unless its findings of fact are not supported by a preponderance of the evidence, its conclusions of law are not supported by its findings of fact, its decision is not supported by its conclusions of law, its decision is not in accordance with the law or violates the appellant's constitutional rights, or the Bureau's rules or procedures deprived the appellant of a fair hearing. *E.g., Geck v. N.D. Workers Comp. Bur.*, 1998 ND 158, ¶ 5, 583 N.W.2d 621.

II

[¶ 7] Hoffner argues North Dakota law dictates his injury is compensable. The general rule in North Dakota is that injuries sustained while traveling to and from work are not compensable. *Diegel v. N.D. Workers Comp. Bur.*, 469 N.W.2d 151, 152 (N.D.1991). There are several exceptions to this general rule. *Id.* One exception is when travel is an integral part of the service for which the worker is employed. *Id.* Larson's treatise on workers compensation describes this exception as follows:

The rule excluding off-premises injuries during the journey to and from work does not apply if the making of that journey, or the special degree of inconvenience or urgency under which it is made, whether or not separately compensated for, is in itself a substantial part of the service for which the worker is employed.

1 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* § 14 (1999).

### A

■ [¶ 8] The North Dakota Legislature codified a version of this exception in N.D.C.C. § 65–01–02(11). *See Diegel,* 469 N.W.2d at 153 (stating "[c]ompensability under this well-recognized exception is recognized in our Workers Compensation statute enacted subsequent to our decision in *Cody [v. N.D. Workmen's Comp. Bur.,* 413 N.W.2d 316 (N.D.1987) ]"). Section 65–01–02(11) provides in relevant part:

> 11. 'Compensable injury' means an injury by accident arising out of and in the course of hazardous employment which must be established by medical evidence supported by objective medical findings.
>
> a. The term includes: ...
>
> (4) Injuries arising out of employer-required or supplied travel to and from a remote jobsite or activities performed at the direction or under the control of the employer.

Hoffner asserts his travel to East Grand Forks was employer-required, and alternatively, employer-supplied travel, to a remote job site.

[¶ 9] In arguing his travel to East Grand Forks was employer-supplied, Hoffner cites the fact Wolf knew Hoffner did not have a license when he was hired. Hoffner asserts Wolf either transported Hoffner to the job site or directed someone else to transport him. Thus, Hoffner argues, his transportation was essentially employer-supplied. The ALJ concluded,

Although Wolf knew that Hoffner did not have a driver's license and therefore would require transportation to the East Grand Forks project job site, there being no evidence to show, or from which it may be reasonably inferred, that Hoffner and Wolf intended that Hoffner's transportation to the East Grand Forks project job site would be provided or otherwise in any way facilitated by Wolf acting on behalf of North Central, there is no basis to imply any agreement that North Central would supply transportation for Hoffner to the job site as a condition of his employment.

The ALJ's conclusion is supported by the testimony. The following exchange took place when Hoffner testified:

Q. But my question was did you just fall into going to work with Corey; that is, you did what Corey did to go to work on that job?

A. I did.

Q. Because he was already working there?

A. Yeah. If he is riding with Wade I'd ride with Wade. If he's driving I'd ride with him.

Q. You and Corey didn't have any discussions about how you were going to get to work?

A. No.

Q. You got up and you and Corey went to work?

A. Actually, we kind of had discussions. Because I told Corey I'd rather drive. He's like—he's like "No." He goes, "Why build up miles on your vehicle or anything. We'll just ride with Wade." And Wade had said that even when I first talked to him, you know. He's like, "You guys can ride with me. Save yourself money on gas or whatever."

[¶ 10] Wolf testified, "Well if I wouldn't want to give him a ride I wouldn't really have to. I'm just doing him a favor. He doesn't have a driver's license. So he said

he was going to ride with Corey, because those two are buddies and stuff. So if he called me and Corey, whenever we left or whatever, called me and asked me if he could ride with me and I said, 'Yes.' " Wolf also stated flatly, "You're on your own as far as getting to any project. You have to drive your own or catch a ride with somebody or somehow get down there by yourself."

[¶ 11] Hoffner was not riding in a company vehicle on the day of the accident, but was riding with his roommate from Fargo. Testimony from both sides demonstrates Hoffner's travel to East Grand Forks was not controlled by Wolf. Thus, the ALJ's conclusion Hoffner's travel to East Grand Forks on April 20, 1998, was not employer supplied is supported by the evidence.

[¶ 12] Hoffner argues the travel to East Grand Forks was employer-required because the travel was incident to Hoffner's employment at East Grand Forks. The ALJ concluded Hoffner's travel to East Grand Forks was not employer-required because Wolf did not control Hoffner's transportation to the job site, "either by providing transportation to Hoffner or by facilitating, supervising, or managing Hoffner's transportation."

[¶ 13] Section 65–01–02, N.D.C.C., was meant to codify existing law. *See Diegel*, 469 N.W.2d at 153. Thus, this provision does not alter the rule that generally injuries arising out of commutes to work are not compensable. There is a legally significant difference between an employer requiring one of its employees to temporarily travel to a remote site and an employee simply choosing to accept a job involving a commute of considerable distance to work.

[¶ 14] If an employee having fixed hours and place of work is not compensated for travel to the place of work, there is a strong presumption the travel to the place of work is not employer required. *See* 1 Larson, *supra* § 13 (stating "[a]s to employees having fixed hours and place of

work, injuries occurring on the premises while they are going to and from work before or after working hours or at lunchtime are compensable, but if the injury occurs off the premises, it is not compensable, subject to several exceptions"); *Ruckman v. Cubby Drilling, Inc.*, 81 Ohio St.3d 117, 689 N.E.2d 917, 920 (1998) (stating "[a]s a general rule, an employee with a fixed place of employment who is injured while traveling to or from his place of employment is not entitled to participate in the Workers' Compensation Fund because the requisite causal connection between injury and the employment does not exist") (quoting *MTD Products, Inc. v. Robatin*, 61 Ohio St.3d 66, 572 N.E.2d 661, 663 (1991)).

[¶ 15] Here, Hoffner's work was centered in one place, East Grand Forks, and he was injured on the daily commute to East Grand Forks. The employer did not require Hoffner make the trip for any special purpose. It was the same place Hoffner worked every day. Nothing else distinguishes this case from normal commuting to and from work. Thus, we agree with the ALJ's conclusion Hoffner's commute with Corey Olson on April 20, 1998 was not employer-required travel.

B

[¶ 16] Hoffner contends our holding in *Diegel* requires reversal of this case. In *Diegel*, Troy Diegel resided in North Fargo, approximately three miles from the job site in Moorhead. Each morning, he drove from his residence to West Fargo to pick up two co-employees. The three then proceeded to the company's West Fargo shop where Diegel exchanged his personal vehicle for a company vehicle, which the men would then drive to the job site in Moorhead. Diegel was injured in an accident on his way to pick up his co-employees in West Fargo.

[¶ 17] We reversed the Department's decision denying Diegel's claim for benefits. We pointed out it was undisputed Diegel's boss "chewed him out" on one occasion

when Diegel failed to drive the company vehicle to the job site and Diegel testified his boss told him if he could not get the company vehicle to the job-site each morning he "might as well not even come." *Id.* at 153. The Bureau countered that another employee could have driven the company vehicle from West Fargo each day. We said "the availability of alternative arrangements, however does not diminish the integral nature of the journey itself." *Id.* Because of the special degree of inconvenience under which the journey was made, the evidence of the employer's expectations of Diegel, and the benefits derived by the employer, we concluded the daily journey to West Fargo was an integral part of the service for which the worker is employed.

[¶ 18] Hoffner asserts this case is analogous to *Diegel* because Wolf testified he had Olson transport some empty gas cans to the East Grand Forks job site on the day of the accident. Hoffner also relies on his testimony that Wolf would give the workers instructions on the ride to work and on the day of the collision Wolf instructed the workers on what they were to do that day before they left for the work site. Wolf agreed they might talk about the work to be done that day before the trip or during the trip, but said it was "just idle talk" and the "real instructions would come when we got there." The ALJ found:

> Considering that Wolf was the superintendent for the steel erection and that Hoffner and other iron workers worked under the supervision of a foreman, that Hoffner and his fellow passengers were but three of the workers on the project, and that they were not paid for the time for their travel to East Grand Forks except for the five or ten minutes they might be late in arriving, there is no basis to conclude that Wolf's comments about the work to be done that day, even if taken as instructions, were such as to make their travel part of their job.

We agree. The evidence indicates the early-morning rendezvous between Wolf and two or three of the workers on the day of the collison was more about carpooling than getting instructions for the day's work.

[¶ 19] Further, Hoffner did not transport the empty gas cans to the work site. Olson did. At most, Hoffner helped Olson transfer the empty gas cans from Wolf's vehicle to Olson's vehicle and helped remove the gas cans from Olson's vehicle at the work site. Loading and unloading empty gas cans does not turn a ride to work into travel integral to the service of the employer.

[¶ 20] Unlike Diegel, Hoffner went through no special degree of inconvenience for the employer. Moreover, while the employer may have gained some benefit in having the gas cans transferred to East Grand Forks and may have even expected the cans to be transported, it was Olson who transported the cans, not Hoffner. *Diegel* is distinguishable from this case and the analysis above demonstrates Hoffner's ride to East Grand Forks on April 20, 1998, was not an integral part of the service for which he was employed.

C

[¶ 21] Hoffner also makes two arguments regarding his compensation. First, Hoffner points out he was paid $12.88 per hour for the East Grand Forks project due to the federal Davis Bacon Act, more than the usual $11 per hour he would receive at other jobs for North Central. Hoffner argues he was not paid a per diem because of the higher wage he was getting while working at the East Grand Forks site and, thus the extra wages were essentially compensation for travel.

[¶ 22] If an employee is paid compensation for travel by an employer, it can be an important factor in finding an injury arising out of the travel to be compensable. *See e.g.,* 1 Larson, *supra* § 14.06[1] (stating "[w]hen the employee is paid an identi-

fiable amount as compensation for time spent in a going or coming trip, the trip is within the course of employment"). The ALJ found "There is no evidence that the greater wage paid for work on the East Grand Forks project in accordance with the requirement of the Davis Bacon Act was in consideration for any travel to and from the job site." Furthermore, even if Hoffner was not paid a per diem because of the higher wage he was receiving, the uncontradicted testimony was that the per diem was for food and lodging, not travel. No part of Hoffner's $12.88 per hour salary was paid to him for travel expenses.

[¶ 23] Second, Hoffner argues he was being compensated at the time of the accident. He asserts the workers were paid beginning at 7:00 a.m. each morning. Because the accident took place shortly after 7:00 a.m., Hoffner asserts the injury should be covered. Wolf's testimony contradicted Hoffner's testimony that the workers were paid each day automatically beginning at 7:00 a.m. Wolf testified employees were not paid until they arrived at the work site. The ALJ concluded even if Hoffner and his coworkers were paid at 7:00 a.m., this did not make their travel to the job site an integral part of the service for which they were employed. We agree.

[¶ 24] Hoffner was not paid for travel to East Grand Forks, because the trip usually began from Fargo between 5:30 and 6:00 a.m. and Hoffner was never paid until 7:00 a.m. Furthermore, we will not endorse a rule that an injury is always compensable as long as the employee is technically "on the clock," since such a rule could make eligibility for benefits turn on whether someone was late for work. Hoffner was not paid to travel to East Grand Forks and the wage issues raised by Hoffner do not demonstrate his travel to East Grand Forks was an integral part of his service to his employer.

### III

[¶ 25] Hoffner asserts the ALJ applied a "substantial evidence" standard to the findings of fact rather than the proper "preponderance of the evidence" standard. Hoffner points to two sentences in the Findings of Fact where the ALJ states, "There is no substantial evidence that it was other than Olson's decision whether he would drive his vehicle to the job site and whether he would provide transportation to his fellow employees. There is no substantial evidence that Wolf either directly or indirectly influenced Olson's decision whether he would drive his vehicle to the job site and take his fellow employees with him."

[¶ 26] Substantial evidence is defined as less than a preponderance. *See Hanson v. Industrial Comm'n. of North Dakota,* 466 N.W.2d 587, 590 (N.D.1991) (defining "substantial evidence" as "something less than the weight of the evidence") (quoting *Consolo v. Federal Maritime Comm'n,* 383 U.S. 607, 619–20, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131, 140–41 (1966)). Blacks Law Dictionary 580 (7th Ed.1999) (defining "substantial evidence" as "[e]vidence that a reasonable mind would accept as adequate to support a conclusion; evidence beyond a scintilla"). The language of the ALJ's opinion demonstrates he is not stating "substantial evidence" is the standard by which the evidence should be weighed. Importantly, the ALJ cites the appropriate evidentiary standard in the order, where he refers to "[t]he greater weight of the evidence." The ALJ's analysis does not indicate he was using the wrong evidentiary standard and we conclude the proper evidentiary standard was applied.

### IV

[¶ 27] Hoffner challenges two of the ALJ's Findings of Fact, claiming they are not supported by a preponderance of the evidence. The first finding challenged by Hoffner states "There is no evidence to show, nor any evidence from which it may be reasonably inferred, that Hoffner and Wolf considered that Hoff-

ner's transportation to the East Grand Forks project job site would be provided or otherwise in any way facilitated by Wolf acting on behalf of North Central." We accord great deference to administrative agency rulings, and we do not make independent findings of fact or substitute our judgment for that of the agency, but we determine only whether a reasoning mind could have reasonably concluded the facts or conclusions were supported by the weight of the evidence. *Seela v. Moore*, 1999 ND 243, ¶ 5, 603 N.W.2d 480.

[¶ 28] A key phrase in this finding overlooked by Hoffner is "acting on behalf of North Central." While there may have been some evidence from Hoffner that Wolf would help facilitate Hoffner's travel to East Grand Forks, the ALJ found there was no evidence Wolf would facilitate Hoffner's travel on behalf of North Central. We conclude the ALJ's finding is supported by the weight of the evidence.

[¶ 29] Hoffner also challenges the following finding:

> Although Hoffner testified that Wolf filled the gas tank of Olson's vehicle a couple of times ... Wolf denied doing that ... and regardless there is no evidence that Wolf was acting within the scope of his authority on behalf of North Central in doing so and that the gasoline was provided for Olson as consideration, or reimbursement of his expenses incurred, for transporting himself and fellow employees to the job site.

Hoffner asserts it is illogical for the ALJ to assume if Wolf provided gas to Olson, he provided it for something other than consideration for driving to work. We look to the testimony available to the ALJ. Wolf testified he never filled up Olson's vehicle with gas. Hoffner testified, "I know for a fact Wade filled him up a couple of times." Hoffner, under further questioning said he did not know whether Wolf used his own money or not:

Q. Then I take it the company also in effect compensated Mr. Corey Olson to the extent that Wade filled

up Corey's pickup or truck with gas on occasions?

A. No. And out of that I don't-

Q. Well, I heard something.

A. I know Wade did that. I'm not trying to get Wade in trouble. I'm not saying Wade-

Q. This has nothing to do with getting Wade in trouble

A. Wade did do that, but I don't know if he used his own money or his own—I don't know that.

After reviewing this testimony, we conclude the ALJ's findings are supported by the preponderance of the evidence.

[¶ 30] We affirm.

[¶ 31] DALE V. SANDSTROM, WILLIAM A. NEUMANN, MARY MUEHLEN MARING, JJ., JAMES H. O'KEEFE, S.J., concur.

[¶ 32] JAMES H. O'KEEFE, S.J., sitting in place of KAPSNER, J., disqualified.