Filed 2/17/12 by Clerk of Supreme Court

IN THE SUPREME COURT

STATE OF NORTH DAKOTA

2012 ND 33

Gadeco, LLC, Appellee

v.

Industrial Commission of the State of North Dakota, Appellant

and

Slawson Exploration Company Appellee

No. 20110131

Gadeco, LLC, Appellee

v.

Industrial Commission of the State of North Dakota, Appellee

and

Slawson Exploration Company Appellant

No. 20110140

Appeal from the District Court of Mountrail County, Northwest Judicial District, the Honorable Richard L. Hagar, Judge.

REVERSED AND REMANDED.

Opinion of the Court by VandeWalle, Chief Justice.

Ariston Edward Johnson (argued) and Dennis Edward Johnson (appeared), P.O. Box 1260, Watford City, N.D. 58854-1260, for Gadeco, LLC.

Lawrence Bender (argued) and Amy Lynn De Kok (on brief), P.O. Box 1855, Bismarck, N.D. 58502-1855, for Slawson Exploration Company.

Charles M. Carvell (argued), Assistant Attorney General, Office of Attorney General, 500 North 9th Street, Bismarck, N.D. 58501-4509, and Todd Adam Sattler (on brief), 500 North 9th Street, Bismarck, N.D. 58501-4509, for Industrial Commission.

Gadeco, LLC v. Industrial Commission

Nos. 20110131 & 20110140

VandeWalle, Chief Justice.

[¶1] The Industrial Commission and Slawson Exploration Company appealed from a district court judgment reversing the Commission’s assessment of a risk penalty against Gadeco, LLC.  Because we are unable to discern the basis for the Commission’s decision, we reverse the judgment and remand to the Commission for the preparation of findings that explain the reasons for its decision.

I

[¶2] Before reciting the facts, we provide some legal background that is helpful to understand the controversy in this case.

[¶3] “In the beginning of the industry, oil and gas development was largely governed by traditional property law concepts, and the rule of capture prevailed.”  
Continental Res., Inc. v. Farrar Oil Co.
, 1997 ND 31, ¶ 10, 559 N.W.2d 841.  Under the rule of capture, the law analogized the ownership of oil to the ownership of water which flowed in underground streams, and it was lawful to capture oil and gas that migrated from another landowner’s property.  
Id.
  The remedy for the injured landowner was to “go and do likewise.”  
Texaco Inc. v. Industrial Comm’n
, 448 N.W.2d 621, 623 n.2 (N.D. 1989) (internal quotations omitted).  “The rule of capture made it economically imperative that each mineral owner drill his land and produce at as rapid a pace as possible, for otherwise his land would be drained of oil and gas by wells on adjacent properties.”  8 P. Martin & B. Kramer, Williams & Meyers 
Oil and Gas Law
, 
Manual of Oil & Gas Terms
 932 (2011).  The court explained in 
Western Land Servs., Inc. v. Department of Envtl. Conservation
, 2004 WL 2563598, at *1 (N.Y. Sup. Nov. 1, 2004):

In the early years of the last century, the rule of capture led to the waste of oil and gas due to a multiplicity of wells in close proximity to each other.  A consequence of too many wells over the pool was that the pressure in the pool would drop rapidly with much product being left in the ground with no way to put pressure on it to get it out.  It eventually occurred to those in the oil industries and state governments that this was a process wasteful of natural resources and overly expensive due to the proliferation of wells and delivery systems.

 

[¶4] “Like other states, the North Dakota legislature recognized that traditional property law principles contributed to inefficiency and waste in oil and gas development, and so enacted an Act for the Control of Gas and Oil Resources in 1953.”  
Continental Res., Inc.
, 1997 ND 31, ¶ 12, 559 N.W.2d 841.  The Act, which is codified at N.D.C.C. ch. 38-08, modifies the rule of capture “by authorizing the Commission to set spacing units for a common source of supply ‘[w]hen necessary to prevent waste, to avoid the drilling of unnecessary wells, or to protect correlative rights.’”  
Texaco Inc.
, 448 N.W.2d at 623 (quoting N.D.C.C. § 38-08-07(1)).  When separately owned interests are embraced within a spacing unit, the working interest owners may voluntarily pool their separately owned interests or, in the absence of voluntary pooling, the Commission must enter an order pooling all interests in the spacing unit, and the working interest owners must pay their share of the costs of drilling, operating, and supervising the well on the spacing unit.  
See
 N.D.C.C. § 38-

08-08; 
Egeland v. Continental Res., Inc.
, 2000 ND 169, ¶ 12, 616 N.W.2d 861; 
Continental Res. Inc.
, at ¶¶ 13-14.  When a pooled working interest owner does not pay, the owner who drills and operates the well has a lien on that owner’s share of production for the proportionate share of expenses.  
See
 N.D.C.C. § 38-08-08(2).

[¶5] Although N.D.C.C. § 38-08-08(2) allows the working interest owner who drills a well a lien against a nonparticipating interest owner’s share of production on the well, state law did not afford a mechanism to recover costs if the well was unsuccessful.  Consequently, in situations where working interest owners could not agree on the drilling of a well, “[i]f the well [wa]s a dry hole, a nonparticipating owner los[t] nothing and owe[d] nothing.”  
Matter of SAM Oil, Inc.
, 817 P.2d 299, 302 (Utah 1991); 
see also
 1 B. Kramer & P. Martin, 
The Law of Pooling and Unitization
 § 12.01 (3rd ed. 2011) (“Success has a thousand fathers; a dry hole is an orphan.”).  Courts and state governments recognized that it is “unfair for a nonconsenting owner or nondriller lessee to be relieved of the costs and risks associated with drilling a producing well, but at the same time reap the benefits of another’s efforts in extracting oil or gas from beneath his or her land.”  
Western Land Servs., Inc. v. Department of Envtl. Conservation
, 804 N.Y.S.2d 465, 467 (Sup. Ct. App. Div. 2005) (footnote omitted).  In an effort “to ensure that nonparticipating owners do not benefit from the successful outcome of risks they do not take,” 
Matter of SAM Oil, Inc.
, 817 P.2d at 302, states have authorized penalties typically called a “nonconsent penalty” or “risk penalty” to be imposed on nonconsenting working interest owners as “a reasonable way to allocate risks and balance the diverse interests involved in the pooling of oil and gas interests.”  
Bennion v. ANR Prod. Co.
, 819 P.2d 343, 347 (Utah 1991); 
see also
 1 B. Kramer & P. Martin, 
The Law of Pooling and Unitization
, 
supra
.

[¶6] North Dakota’s “risk penalty” provisions were first adopted by the Legislature in 1991.  
See
 1991 N.D. Sess. Laws ch. 388.  Section 38-08-08(3), N.D.C.C., currently provides:

3. In addition to any costs and charges recoverable under subsections 1 and 2, if the owner of an interest in a spacing unit elects not to participate in the risk and cost of drilling a well thereon, the owner paying for the nonparticipating owner’s share of the drilling and operation of a well may recover from the nonparticipating owner a risk penalty for the risk involved in drilling the well. The recovery of a risk penalty is as follows:

a. If the nonparticipating owner’s interest in the spacing unit is derived from a lease or other contract for development, the risk penalty is two hundred percent of the nonparticipating owner’s share of the reasonable actual costs of drilling and completing the well and may be recovered out of, and only out of, production from the pooled spacing unit, as provided by section 38-08-10, exclusive of any royalty or overriding royalty.

b. If the nonparticipating owner’s interest in the spacing unit is not subject to a lease or other contract for development, the risk penalty is fifty percent of the nonparticipating owner’s share of the reasonable actual costs of drilling and completing the well and may be recovered out of production from the pooled spacing unit, as provided by section 38-08-10, exclusive of any royalty provided for in subsection 1.

c. The owner paying for the nonparticipating owner’s share of the drilling and operation of a well may recover from the nonparticipating owner a risk penalty for the risk involved in drilling and completing the well only if the paying owner has made an unsuccessful, good-faith attempt to have the unleased nonparticipating owner execute a lease or to have the leased nonparticipating owner join in and participate in the risk and cost of drilling the well.  Before a risk penalty may be imposed, the paying owner must notify the nonparticipating owner with proof of service that the paying owner intends to impose a risk penalty and that the nonparticipating owner may object to the risk penalty by either responding in opposition to the petition for a risk penalty or if no such petition has been filed, by filing an application or request for hearing with the industrial commission.

 

A 200 percent risk penalty means the nonconsenting owner will relinquish his or her right to receive his or her share of production revenue until the consenting parties recover two times the nonconsenting owner’s share of the expenses.  
See
 
Dorsett v. Valence Operating Co.
, 111 S.W.3d 224, 229 (Tex. Ct. App. 2003), 
reversed on other grounds
, 164 S.W.3d 656 (Tex. 2005).

[¶7] The Commission has promulgated an administrative rule governing the requirements for an owner’s recovery of a risk penalty:

1. An owner may recover the risk penalty under the provisions of subsection 3 of North Dakota Century Code section 38-08-08, provided the owner gives, to the owner from whom the penalty is sought, a written invitation to participate in the risk and cost of drilling a well, including reentering a plugged and abandoned well, or the risk and cost of reentering an existing well to drill deeper or a horizontal lateral.  If the nonparticipating owner’s interest is not subject to a lease or other contract for development, an owner seeking to recover a risk penalty must also make a good-faith attempt to have the unleased owner execute a lease.

 

a. The invitation to participate in drilling must contain the following:

(1) The location of the proposed or existing well and its proposed depth and objective zone.

(2) An itemization of the estimated costs of drilling and completion.

(3) The approximate date upon which the well was or will be spudded
(footnote: 1) or reentered.

(4) A statement indicating the invitation must be accepted within thirty days of receiving it.

(5) Notice that the participating owners plan to impose a risk penalty and that the nonparticipating owner may object to the risk penalty by either responding in opposition to the petition for a risk penalty, or if no such petition has been filed, by filing an application or request for hearing with the commission.

b. An election to participate must be in writing and must be received by the owner giving the invitation within thirty days of the participating party’s receipt of the invitation.

 

N.D. Admin. Code § 43-02-03-16.3(1)(a) and (b).

II

[¶8] The controversy in this case involves the validity of an invitation to participate in the cost of drilling a well which resulted in the Commission’s assessment of a 200 percent risk penalty.

[¶9] Slawson and Gadeco are owners of oil and gas leasehold interests in a section of real property located in Mountrail County which comprises the spacing unit for the Coyote 1-32H well.  On July 8, 2009, Slawson sent to Gadeco and to other working interest owners in the spacing unit invitations to participate in the cost of drilling and completing the well.  The letter stated:

Slawson Exploration Company, Inc., proposes to drill the Coyote #1-32H well from a surface location in the SWSE of Section 32-152N-92W, Mountrail County, North Dakota.  This well will test the Bakken formation and will be drilled to an approximate total vertical depth not to exceed 10,500 feet, with a single lateral terminating in the N2NE of Section 32.  This is a 640-acre spacing unit comprised of the above-referenced section.  The estimated spud date for the Coyote #1-32H is 
August 25, 2009
.

 

A recent records check indicates that you have a leasehold interest in this spacing unit, and you are offered participation in the Coyote #1-32H well based upon your ownership.  Please indicate your election to participate in this well in the space provided at the end of this letter.

 

In the event you do not elect to participate in the drilling of the Coyote #1-32H well, Slawson plans to impose a risk penalty in accordance with North Dakota law.  You may object to the risk penalty by filing an application or request for hearing with the North Dakota Industrial Commission.

 

If you choose to participate in this well, please sign the attached AFE (authority for expenditure) with costs of $2,707,375 DHC (dry hole costs) and $4,219,256 completed.  Return this letter and AFE within 30 days by mail, e-mail, or fax . . . .

 

[¶10] On July 15, 2009, Slawson sent another letter to Gadeco and the other working interest owners stating:

Please note the surface location and estimated spud date of the Coyote #1-32H well have changed (proposal originally sent under letter dated July 8, 2009).  The new information is listed below:

 

• The new surface location is NWNE of 
Section 5-151N-92W
, Mountrail County, North Dakota.  The bottom hole location remains the same—N2NE of Section 32-152N-92W.

• The estimated spud date has changed to 
September 27, 2009
 (originally August 25, 2009).

 

[¶11] On August 19, 2009, Gadeco signed and returned the invitation, electing to participate in the well and sending a check for $338,421.87 for its proportionate share of expenses.  On August 20, 2009, Slawson acknowledged receipt of the election and check, but returned the check to Gadeco explaining “[s]ince this proposal was received by Gadeco, LLC, on July 10, 2009, the 30-day election period expired on Monday, August 10, 2009.”  

[¶12] In November 2009, Slawson filed an application with the Commission requesting an order pooling all interests in the well’s spacing unit and authorizing recovery of a 200 percent risk penalty against Gadeco as a nonparticipating owner under N.D.C.C. § 38-08-08(3)(a).  Gadeco objected to assessment of the risk penalty and, following a hearing, the Commission pooled all interests and authorized Slawson to impose the 200 percent risk penalty.  In authorizing assessment of the risk penalty, the Commission stated:

(10) . . . Gadeco believes its election was timely and argues Slawson’s invitation was invalid because the location of the well and spud date were amended. Gadeco argues Slawson was required to revise the AFE and confirm the spacing unit had not changed.  Slawson responded that its letter to Gadeco received on July 17, 2009, indicated the only change was the surface location and the spud date.  Slawson further indicated the AFE was not revised because the new location would be drilled from an existing well site and that savings would offset any additional drilling and completion costs.  Slawson stated it actually spent approximately $3.4 million on drilling and completion costs on the Coyote #1-32H well, much below the estimated costs of $4.2 million.

(11) The Commission concludes Slawson has complied with NDAC Section 43-02-03-16.3 and that because Slawson failed to receive Gadeco’s election by August 10, 2009, the risk penalty may be assessed against Gadeco’s leasehold interests.

 

[¶13] Gadeco appealed the Commission’s decision to district court.  The court reversed, reasoning:

There are five things listed in N.D.A.C. § 43-02-03-16.3(1)(a) that an invitation to participate must include: (1) location of the well; (2) itemization of estimated costs; (3) approximate spud date; (4) statement that the invitation must be accepted within thirty days; and notice that an election not to participate would result in imposition of a risk penalty. After sending out the July 8, 2009 invitation to participate letter, Slawson changed three of the five things required by N.D.A.C. § 43-02-03-16.3(1)(a); i.e., the 
location
 of the well, the 
itemization
 of estimated costs, and the approximate spud 
date
.

It is Gadeco’s position that these changes were material and substantial and should have required Slawson to submit a new invitation to participate to all leaseholders of record.  Gadeco takes the further position that because a new invitation to participate was not issued to Gadeco, the clock for electing to or not to participate has never started to run, and, therefore, the Commission’s decision was not supported by either the law or by substantial and credible evidence.  The Court agrees and finds that because of changes in three of the five things required by N.D.A.C. § 43-02-03-16.3(1)(a), a new offer was being made and a new invitation to participate letter should have been issued, including a new AFE itemizing the changes in the estimated costs and including a place for Gadeco to elect or not elect to participate based on the terms set out within.

 

(Footnote omitted).

III

[¶14] On appeal, the Commission and Slawson argue the district court erred because the Commission’s decision that Gadeco failed to timely elect to participate and is subject to the risk penalty is supported by the law and by substantial evidence. 

A

[¶15] The standard of judicial review of Commission orders is set forth in N.D.C.C. § 38-08-14(3), which provides that “[o]rders of the commission must be sustained by the district court if the commission has regularly pursued its authority and its findings and conclusions are sustained by the law and by substantial and credible evidence.”  This Court applies the same standard of review in appeals from district court involving orders of the Commission.  
See
 
Amoco Prod. Co. v. North Dakota Indus. Comm’n
, 307 N.W.2d 839, 842 (N.D. 1981).  The “substantial evidence” test “is something less” than the greater weight of the evidence and the preponderance of the evidence tests, and differs from the usual standard of review for administrative decisions under N.D.C.C. § 28-32-46.  
Hanson v. Industrial Comm’n
, 466 N.W.2d 587, 590 (N.D. 1991).  “Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,” and we “accord greater deference to Industrial Commission findings of fact than we ordinarily accord to other administrative agencies’ findings of fact.”  
Id.
  The Commission’s decisions on questions of law are fully reviewable on appeal.  
See
 
Imperial Oil, Inc. v. Industrial Comm’n
, 406 N.W.2d 700, 702 (N.D. 1987).

[¶16] The Commission’s findings of fact must be sufficient to enable this Court to understand the basis for its decision.  
See
 
Hanson
, 466 N.W.2d at 593.  Even in subject areas that entail administrative expertise, “that expertise must be directed toward the statutory standards set forth by the legislature so that reviewing courts may have the benefit of that expertise.”  
Hystad v. Industrial Comm’n
, 389 N.W.2d 590, 598 (N.D. 1986).  If the reasons given do not enable us to understand the basis for the decision, the Commission’s decision cannot be sustained.  
Id.

B

[¶17] The Commission and Slawson argue the changes made to the well did not require a new amended invitation to participate because those changes were not “material” or “substantial.”  They contend that, although the surface well location was changed, the bottom hole location remained the same, so the change was insignificant.  They contend the itemization of costs did not materially change because any increased drilling costs were offset by savings realized on the new surface well location.  They contend the change in the spud date was insignificant because it did not affect the cost of the well and would not have affected a working interest owner’s overall decision to participate in the drilling of the well.  Slawson argues “the Commission’s rules provide a level of flexibility in light of the changes and/or adjustments that commonly and routinely occur in drilling plans in the industry,” and the Commission agrees that it must be allowed to “evaluate[] the substantive nature of the changes.”  They also rely on the testimony of Slawson’s chief operating officer who said he was told by a Gadeco employee that the company “missed their election” because “someone was on vacation and it sat on a desk.”

[¶18] Gadeco argues a new invitation to participate was required because the applicable regulations do not allow for changes, regardless of whether the changes are “substantial,” and even if insubstantial or immaterial changes can be made, the changes here were “substantial” and “material.”  Gadeco contends the change in the well location was material because the well was drilled in a different section one quarter mile south of the original well location.  Gadeco contends the change in the itemization of costs was material because, even if the estimated total of the well costs did not change, the line items of costs did change.  Gadeco contends the change in the spud date was material because it was delayed by more than one month.  Gadeco also presented testimony that it initiated a series of contacts with Slawson after receiving the July 15, 2009, letter and requested a new AFE and operating agreement, but never received any answers to their questions about the changes.

[¶19] The Commission’s decision in this case does not explain how it reached the conclusion that the risk penalty could be assessed, except to note Slawson “complied” with the pertinent regulations and Gadeco’s election was untimely because it was not received by Slawson by August 10, 2009.  There can be no serious dispute that changes were made to the original invitation to participate.  Although the Commission and Slawson argue the changes were not material or substantial, the decision fails to explain that the Commission was employing this standard, let alone why it did not deem the changes to be material or substantial.  

[¶20] The argument that immaterial or insubstantial changes do not necessitate a new amended invitation to participate is compatible with the administrative requirements for the “estimated” costs and the “approximate” spud date under N.D. Admin. Code § 43-02-03-16.3(1)(a)(2) and (3).  The administrative requirement for the location of the well does not call for an estimation or an approximation.  
See
 N.D. Admin. Code § 43-02-03-16.3(1)(a)(1).  But even if immaterial or insubstantial deviations from the administrative requirements that do not refer to estimations or approximations are allowable, 
see
 N.D.C.C. § 31-11-05(24) (“The law disregards trifles.”), the Commission and Slawson have offered no explanation why, in view of the changes that were made, Gadeco’s ten-day tardiness in accepting the invitation and forwarding its share of the costs is not an equally immaterial and insubstantial deviation.  Moreover, the Commission might well have based its decision on other unspecified factors.

[¶21] The Commission must provide some indication that it is complying with the law before a reviewing court can afford any deference to its decisions.  
See
 
Hystad
, 389 N.W.2d at 598.  Although the district court ruled a new invitation to participate was necessary “because of changes in three of the five things required” under the administrative regulation, a reviewing court needs to know the reasons for the Commission’s decision before the court can intelligently rule on the issues.  Because the Commission’s findings are insufficient to enable us to understand the basis for its decision, we reverse the judgment and remand to the Commission for the preparation of findings of fact that reveal the basis for its decision.

IV

[¶22] We reverse the district court judgment and remand to the Commission for further proceedings.

[¶23] Gerald W. VandeWalle, C.J.

Dale V. Sandstrom

Daniel J. Crothers

Mary Muehlen Maring

Carol Ronning Kapsner

FOOTNOTES
1:    
“Spudding in” is defined as “[t]he first boring of the hole in the drilling of an oil well.”  8 P. Martin & B. Kramer, Williams & Meyers 
Oil and Gas Law
, 
Manual of Oil & Gas Terms
 996 (2011)