2017 ND·284

**BLACK HILLS TRUCKING,
INC., Appellant**

v.

**NORTH DAKOTA INDUSTRIAL
COMMISSION, Appellee**

No. 20170086

Supreme Court of North Dakota.

Filed 12/7/2017

John W. Morrison Jr. (argued) and Anthony J. Ford (appeared), Bismarck, ND, for appellant.

Hope L. Hogan (argued) and David P. Garner (appeared), Office of the Attorney General, Bismarck, ND, for appellee.

Kapsner, Surrogate Judge.

[¶ 1] Black Hills Trucking, Inc., appeals from a judgment affirming an Industrial Commission order assessing a $950,000 civil penalty and costs and expenses against it for illegally dumping saltwater on roads in Williams County. We conclude the Commission regularly pursued its authority and its findings and conclusions are sustained by the law and by substantial and credible evidence. We affirm.

I

[¶ 2] Black Hills is a Wyoming corporation that is in the business of transporting crude oil, produced saltwater, petroleum products, oilfield equipment and other materials. During 2014 Black Hills owned and operated trucks in North Dakota for the purpose of transporting oilfield waste. On February 11, 2014, the Commission received a report from a security officer for Continental Resources, Inc., that he had photos and video of a Black Hills truck dumping substantial amounts of fluids onto roads near a saltwater disposal well in Williams County. Commission staff examined the affected roads and collected a soil sample. The Commission also collected logs from the well which indicated a Black Hills driver had transported saltwater to the well on February 8, 2014.

[¶ 3] On February 14, 2014, a Commission field technician observed a Black Hills truck leave the same well site and stop on the road. The driver opened the valves on the tractor trailer and drove away discharging produced fluids on the road. The technician followed the truck until it pulled off of the highway and into a truck yard where it continued to discharge fluids on the ground that pooled under the open valves. The technician took a sample directly from the discharging fluids and took soil samples from the road. Commission staff then requested a meeting with Black Hills to discuss the incident, and a meeting was held on February 28, 2014.

[¶ 4] At the meeting, Commission staff discussed Black Hills' understanding of the

February 14 incident and the company's response to it. The February 8 incident was not discussed because the Commission was continuing to investigate what occurred. Black Hills placed the truck driver on probation and reprimanded him through the loss of his safety award and bonus.

[¶ 5] On March 3, 2014, the Commission confirmed through lab analysis that the soil sample from the February 8 incident contained elevated levels of electrical conductivity and chlorides consistent with saltwater. On the same day the Commission received another report of a Black Hills truck improperly dumping fluids. Employees at the same well site observed the truck unloading saltwater and exiting, leaving a trail of saltwater from the disposal well, continuing off the well site and onto a county road until it intersected a highway. One of the employees confirmed that the discharged fluids contained saltwater. On March 6, 2014, the Commission received the lab analysis of the samples related to the February 14 incident which also indicated high levels of electrical conductivity and chlorides consistent with saltwater. Black Hills did not file a spill report, test to determine the extent of contamination, develop a remediation plan or take any further actions to clean up or remediate the areas affected by the improper discharge of saltwater from the three incidents.

[¶ 6] On March 13, 2014, the Commission issued an administrative complaint against Black Hills for the three incidents and requested penalties in the amount of $950,000 and costs and expenses of $1,526. Counts one through three of the complaint claimed violations of N.D. Admin. Code § 43–02–03–19.2 for dumping the produced fluids on three occasions. Counts four through six alleged violations of N.D. Admin. Code § 43–02–03–30.1 for allowing the fluids to infiltrate the soils on three occasions. Counts seven through nine alleged violations of N.D. Admin. Code § 43–02–03–30.1 for failing to properly remove the discharged fluids from the roads. Count 10 sought the Commission's investigative costs and expenses under N.D.C.C. § 28–32–26. The Commission sought fines of $12,500 per day for each violation. The vast majority of the Commission's proposed fine related to the violations alleged in counts seven through nine.

[¶ 7] On March 19, 2014, the Department of Health issued a notice of violation against Black Hills concerning the three incidents and its failure to report them, as well as its failure to have a valid waste transporter's permit for the previous six years. The Department alleged Black Hills "placed wastes where they may cause pollution of waters of the state" in violation of N.D.C.C. § 61–28–06(1). To resolve that proceeding, Black Hills entered into an administrative consent agreement with the Department under which Black Hills admitted responsibility for the oilfield waste illegally discharged during the three incidents. Black Hills agreed to an administrative penalty of $459,000, with $259,000 of that amount suspended.

[¶ 8] An evidentiary hearing on the Commission's administrative complaint was held in December 2015 before an administrative law judge ("ALJ"). In February 2016, the ALJ recommended that the complaint against Black Hills be dismissed with prejudice. The ALJ's decision was presented to the Commission at its March 2016 meeting, and after an executive session with its legal counsel, the Commission rejected most of the ALJ's recommendations and directed its legal counsel to draft an alternative order for consideration. At its April 2016 meeting, the Commission approved an alternative decision by unanimous vote finding Black Hills violated the

regulations and assessing against it a $950,000 civil penalty and $1,526 in costs and expenses. The district court affirmed the Commission's order.

## II

[¶ 9] On appeal, Black Hills challenges the Commission's order on numerous grounds.

[¶ 10] Our standard of review of Commission orders is very limited. In *Langved v. Cont'l Res., Inc.*, 2017 ND 179, ¶ 8, 899 N.W.2d 267, we explained:

> The standard of judicial review of Commission orders is set forth in N.D.C.C. § 38–08–14(3), which provides that "[o]rders of the commission must be sustained by the district court if the commission has regularly pursued its authority and its findings and conclusions are sustained by the law and by substantial and credible evidence." This Court applies the same standard of review in appeals from district court involving orders of the Commission. *See Amoco Prod. Co. v. North Dakota Indus. Comm'n*, 307 N.W.2d 839, 842 (N.D. 1981). The "substantial evidence" test "is something less" than the greater weight of the evidence and the preponderance of the evidence tests, and differs from the usual standard of review for administrative decisions under N.D.C.C. § 28–32–46. *Hanson v. Industrial Comm'n*, 466 N.W.2d 587, 590 (N.D. 1991). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and we "accord greater deference to Industrial Commission findings of fact than we ordinarily accord to other administrative agencies' findings of fact." *Id.* The Commission's decisions on questions of law are fully reviewable on appeal. *See Imperial Oil of North Dakota, Inc. v. Industrial*

*Comm'n*, 406 N.W.2d 700, 702 (N.D. 1987).

(quoting *Gadeco, LLC v. Indus. Comm'n*, 2012 ND 33, ¶ 15, 812 N.W.2d 405).

## A

[¶ 11] Black Hills argues the Commission lacks jurisdiction over a discharge of produced saltwater on a public road occurring away from an oil and gas well site, disposal site, treatment plant, or other facility.

[¶ 12] "Under N.D.C.C. ch. 38–08, the Commission has extremely broad and comprehensive powers to regulate oil and gas development in the state." *Langved*, 2017 ND 179, ¶ 12, 899 N.W.2d 267; *see also Envtl. Driven Solutions, LLC v. Dunn Cty.*, 2017 ND 45, ¶ 9, 890 N.W.2d 841; *GEM Razorback, LLC v. Zenergy, Inc.*, 2017 ND 33, ¶ 10, 890 N.W.2d 544. "The Commission's powers are continuous . . . and are exclusive.'" *Dunn Cty.*, at ¶ 9 (quoting *Egeland v. Cont'l Res., Inc.*, 2000 ND 169, ¶ 11, 616 N.W.2d 861). Section 38–08–04, N.D.C.C., provides in relevant part:

> The commission has continuing jurisdiction and authority over all persons and property, public and private, necessary to enforce effectively the provisions of this chapter. The commission has authority, and it is its duty, to make such investigations as it deems proper to determine whether waste exists or is imminent or whether other facts exist which justify action by the commission. The commission has the authority:
>
> . . . .
>
> 2. To regulate:
>
> a. The drilling, producing, and plugging of wells, the restoration of drilling and production sites, and all other operations for the production of oil or gas.
>
> . . . .

e. Disposal of saltwater and oilfield wastes.

(1) The commission shall give all affected counties written notice of hearings in such matters at least fifteen days before the hearing.

(2) The commission may consider, in addition to other authority granted under this section, safety of the location and road access to saltwater disposal wells, treating plants, and all associated facilities.

[¶ 13] Section 38–08–04(2)(a) and (e), N.D.C.C., unambiguously give the Commission authority to regulate "all other operations for the production of oil or gas" including "[d]isposal of saltwater and oilfield wastes." We have interpreted these provisions broadly in recognizing the Commission's statutory authority to regulate "the disposal of saltwater and oilfield wastes." *Dunn Cty.*, 2017 ND 45, ¶ 13, 890 N.W.2d 841. The Commission has promulgated a regulation governing disposal of waste material which provides "[a]ll waste material associated with exploration or production of oil and gas must be properly disposed of in an authorized facility in accord with all applicable local, state, and federal laws and regulations," and "[a]ll waste material recovered from spills, leaks, and other such events shall immediately be disposed of in an authorized facility, although the remediation of such material may be allowed onsite if approved by the director." N.D. Admin. Code § 43–02–03–19.2. Although Black Hills suggests on appeal that saltwater does not qualify as oilfield waste, Black Hills admitted in the administrative proceedings that "produced water is included within either 'saltwater and oilfield wastes' [under N.D.C.C. § 38–08–04(2)(e) ] or 'waste material associated with the exploration or production of oil and gas' [under N.D. Admin. Code § 43–02–03–19.2]." *See also* N.D. Admin. Code § 43–02–03–19.3 ("no saltwater, drilling mud, crude oil, waste oil, or other waste shall be stored in earthen pits or open receptacles").

■ [¶ 14] Black Hills argues that N.D.C.C. § 38–08–04(2)(e) does not support the Commission's assertion of jurisdiction because Williams County was not provided written notice of the hearing in this case and because its jurisdiction is limited to saltwater disposal wells, treating plants, and facilities. First, Williams County is the entity entitled to complain about lack of notice in this case, and it has not done so. Black Hills has not alleged prejudice from the county's lack of notice. A party "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights and interests of third parties." *Flatt ex rel. Flatt v. Kantak*, 2004 ND 173, ¶ 38, 687 N.W.2d 208 (internal citation omitted). Second, Black Hills' narrow interpretation of N.D.C.C. § 38–08–04(2)(a) and (e) conflicts with our recognition of the broad and unambiguous authority the legislature has given the Commission to "regulat[e] the disposal of saltwater and oilfield wastes." *Dunn Cty.*, 2017 ND 45, ¶ 13, 890 N.W.2d 841. Black Hills' argument limiting the Commission's jurisdiction over saltwater or other oilfield waste disposal to only the physical location of the facilities themselves, and not to any property between the site the waste is generated and the site the waste is disposed, ignores the plain language of the statute and reality. Saltwater and other oilfield wastes by necessity must often be transported to a disposal site. The Commission has the authority to regulate the disposal of saltwater and oilfield waste and has continuing jurisdiction "over all persons and property, public and private, necessary to enforce effectively the provisions" of N.D.C.C. ch. 38–08. N.D.C.C. § 38–08–04; *see also Dunn Cty.*, at ¶ 13.

[¶ 15] Black Hills contends the Commission's jurisdictional claims over the cleanup of a produced water spill occurring away from a well site or disposal facility are contradicted by N.D. Admin. Code § 43–02–03–30.1, which in 2014 provided:

> At no time shall any spill or leak be allowed to flow over, pool, or rest on the surface of the land or infiltrate the soil. Discharged fluids must be properly removed and may not be allowed to remain standing within or outside of diked areas, although the remediation of such fluids may be allowed onsite if approved by the director. Operators must respond with appropriate resources to contain and clean up spills.

[¶ 16] Black Hills contends that the regulation imposes spill containment and cleanup responsibilities only on "operators," and an "operator" is defined by the regulations as "the principal on the bond covering a well and such person shall be responsible for drilling, completion, and operation of the well, including plugging and reclamation of the well site." N.D. Admin. Code § 43–02–03–01(37). Because Black Hills is a hauler of produced saltwater and not a principal on a bond covering a well, Black Hills argues it did not violate any duty to contain and clean up spills. Furthermore, because N.D. Admin. Code § 43–02–03–30.1 has since been amended to read "Operators and responsible parties must respond with appropriate resources to contain and clean up spills" (emphasis added), Black Hills argues the amendment evidences that no duties were imposed upon non-operators when the spills occurred. The Commission argues the amendment merely clarified its intention that all culpable parties are responsible for remediation and cleanup.

[¶ 17] "Administrative regulations are derivatives of statutes and are construed under rules of statutory construction." *Gadeco, LLC v. Indus. Comm'n*, 2013 ND 72, ¶ 10, 830 N.W.2d 535. We have often said " '[t]he principles of statutory construction do not prevent a court from looking to subsequent enactments and amendments as an aid in arriving at the correct meaning of a prior statute.' " *N.D. Pub. Serv. Comm'n v. Valley Farmers Bean Ass'n*, 365 N.W.2d 528, 546–47 (N.D. 1985) (quoting *State v. Novak*, 338 N.W.2d 637, 640 (N.D. 1983)); *see also City of Bismarck v. Santineau*, 509 N.W.2d 56, 58 n.1 (N.D. 1993); *State v. Thomas*, 420 N.W.2d 747, 753 n.5 (N.D. 1988); *Slawson v. N.D. Indus. Comm'n*, 339 N.W.2d 772, 775 n.2 (N.D. 1983). The first sentence of N.D. Admin. Code § 43–02–03–30.1 contains a general prohibition against spills or leaks regardless of where they occur. The second sentence requires that discharged fluids be "properly removed" regardless of where the discharge occurs, *i.e.*, "within or outside of diked areas." The third sentence speaks only of an operator's duty to respond "with appropriate resources" to contain and clean up spills. Black Hills' argument that only "operators" are responsible for cleanup ignores the first two sentences of the regulation. We agree with the Commission that the third sentence's silence regarding the "resources" non-operators should apply to contain and clean up spills does not relieve non-operators from their duty to properly remove any spill or leak that occurs beyond a well site. The amendment to the rule merely requires all responsible parties to respond with appropriate resources to clean up spills.

[¶ 18] Black Hills' reliance on N.D. Admin. Code § 43–02–03–30.1 is solely for the purpose of attacking the Commission's jurisdiction, which clearly exists under N.D.C.C. § 38–08–04(2)(a) and (e). We recognize a defendant's reasonable interpretation of and reliance on an ambiguous regu-

lation may be a successful defense based on lack of notice in an administrative enforcement proceeding. *See, e.g., Elgin Nursing and Rehab. Ctr. v. U.S. Dep't of Health and Human Servs.*, 718 F.3d 488, 494 (5th Cir. 2013); *United States v. Sci. Applications Int'l Corp.*, 653 F.Supp.2d 87, 97 (D.Ct. D.C. 2009). But Black Hills is not claiming a lack of notice because it believed the regulation only applied to "operators" in an oil and gas sense. In other words, Black Hills does not assert that during the February 28, 2014 meeting with Commission staff it disclaimed responsibility for remediation because it was not an "operator" under the regulation. Instead, Black Hills disciplined the driver of the truck. This is not a notice issue.

 [¶ 19] Although we generally defer to an administrative agency's reasonable interpretation of its governing statutes and rules, *see, e.g., Indus. Contractors, Inc. v. Workforce Safety & Ins.*, 2009 ND 157, ¶ 6, 772 N.W.2d 582; *St. Benedict's Health Ctr. v. N.D. Dep't of Human Servs.*, 2004 ND 63, ¶ 9, 677 N.W.2d 202, no deference is required to support the Commission's jurisdiction in this case. We conclude the Commission has jurisdiction over the illegal discharge of saltwater from the point it was generated to the point it is disposed, and Black Hills' actions fall within the Commission's jurisdiction.

### B

[¶ 20] Black Hills argues that even if the Commission has jurisdiction over these incidents, its order unnecessarily encroaches on the primary jurisdiction of the Department of Health.

[¶ 21] The Department has the statutory authority to supervise the administration and enforcement of N.D.C.C. ch. 61–28 relating to the control, prevention, and abatement of the pollution of surface waters. *See* N.D.C.C. § 61–28–04(1); N.D.

Admin. Code art. 33–16. The Department also has the authority to administer N.D.C.C. ch. 23–29 relating to solid waste management and land protection. *See* N.D.C.C. § 23–29–04(1); N.D. Admin. Code art. 33–20. Black Hills argues the Department's "comprehensive authority over the transportation of solid waste," including liquids, gives the Department primary jurisdiction over the spills in this case. The Commission acknowledges that the agencies' jurisdiction over oilfield waste may overlap to some degree, but argues this situation is not prohibited under the law.

 [¶ 22] The United States Supreme Court has recognized that "[r]edundancies across statutes are not unusual events in drafting, and so long as there is no 'positive repugnancy' between two laws, ... a court must give effect to both." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) (internal citation omitted); *see also United States v. Borden Co.*, 308 U.S. 188, 198, 60 S.Ct. 182, 84 L.Ed. 181 (1939) ("When there are two acts upon the same subject, the rule is to give effect to both if possible."). There is no positive repugnancy between the authority granted to the Commission and the authority granted to the Department.

[¶ 23] We conclude the Department does not have primary jurisdiction over this oilfield waste matter and both the Department and the Commission could exercise their regulatory jurisdiction.

### C

 [¶ 24] Black Hills argues the penalties assessed against it are unconstitutionally excessive in violation of N.D. Const. art. I, § 11.

 [¶ 25] The parties agree that, because of the similarities between the

state and federal excessive fines clauses, this Court should analyze the issue under *United States v. Bajakajian*, 524 U.S. 321, 334, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998), where the United States Supreme Court held the federal excessive fines clause is violated if the fine "is grossly disproportional to the gravity of a defendant's offense." The two considerations identified by the Supreme Court for judging constitutional excessiveness are: 1) "judgments about the appropriate punishment for an offense belong in the first instance to the legislature;" and 2) "any judicial determination regarding the gravity of a particular criminal offense will be inherently imprecise." *Id.* at 336, 118 S.Ct. 2028.

[¶ 26] Here, the legislature through its enactment of N.D.C.C. § 38–08–16(1), has authorized a civil penalty "not to exceed twelve thousand five hundred dollars for each offense, and each day's violation is a separate offense." "Generally, a sentence within the statutory sentencing range is neither excessive nor cruel." *State v. Gomez*, 2011 ND 29, ¶ 28, 793 N.W.2d 451; *see also State v. Flohr*, 310 N.W.2d 735, 738 (N.D. 1981) (where sentence was authorized by statute, it did not violate the state excessive fines clause). In imposing the penalty, the Commission explained in its order:

> Contrary to the ALJ's conclusion, the Commission believes the penalty it seeks to assess is appropriate and constitutional. The Commission is charged with the orderly control of the State's oil and gas resources, which includes the protection of the State and its citizens from these types of reckless and detrimental violations to the environment. Although the harm from Black Hill's illegal dumping may not be readily quantifiable, the illegal dumping of saltwater is a legitimate and obvious harm and the levying of

penalties against companies that damage the environment but refuse to clean their illegal spills, may deter future illegal activities in the future. *See, e.g., Towers v. City of Chicago*, 173 F.3d 619, 625 (7th Cir. 1999). A penalty is not unconstitutional simply because it may serve as a deterrent. The Commission takes these issues so seriously that the Commission sought a criminal conviction against [the truck driver] for the February 14, 2014 incident.

[¶ 27] Black Hills argues there is no proportionality between the size of the fine and the harm suffered by the public. According to Black Hills, this is evidenced by the Commission's estimation of the spills to range "from a few gallons to a hundred gallons" and the lack of requests for remediation from the Department and local officials. Because the Commission did not quantify the volume of saltwater discharged and did not present evidence of the amount of harm to the environment caused by the discharges, Black Hills argues the fine is unconstitutional.

[¶ 28] The party challenging the constitutionality of governmental actions bears the heavy burden of producing evidence showing why the actions are unconstitutionally defective. *See, e.g., State v. Francis*, 2016 ND 154, ¶ 18, 882 N.W.2d 270; *Newman Signs, Inc. v. Hjelle*, 268 N.W.2d 741, 756 (N.D. 1978). The fine imposed by the Commission is authorized under N.D.C.C. § 38–08–16(1). If the volume of saltwater discharged and the resulting environmental harm are "minimal" in this case as Black Hills suggests, it had the burden to establish these facts. Black Hills presented no evidence on these issues, and consequently, it has not established the fine is unconstitutionally excessive.

## D

[¶ 29] Black Hills argues the Commission's conduct during this case violated basic notions of fundamental fairness.

[¶ 30] Due process requires that administrative proceedings conform with "[b]asic notions of fundamental fairness." *Morrell v. N.D. Dep't of Transp.*, 1999 ND 140, ¶ 9, 598 N.W.2d 111. "[D]ue process is flexible and must be analyzed on a case-by-case basis, balancing the competing interests and assessing whether the basic due process requirement of fairness has been satisfied." *Wahl v. Morton Cty. Soc. Servs.*, 1998 ND 48, ¶ 6, 574 N.W.2d 859. Black Hills relies upon an unreported decision, *United States v. ITT Cont'l Baking Co.*, No. C-1220, 1971 WL 596 *2 (D.Ct. Colo. Aug. 2, 1971), in which the court, in the context of a Federal Trade Commission proceeding, stated, "as obiter dictum, it would seem unreasonable to permit the Commission to knowingly let daily penalties accrue without giving notice of the Commission's position at the earliest reasonable time." Black Hills contends that when it met with Commission staff on February 28, 2014 to discuss the February 14, 2014 incident, the Commission "intentionally withheld the information" about the February 8, 2014 incident. Black Hills argues that if it had been informed of the February 8 incident at the meeting, "the third incident on March 3, 2014 could have been prevented." By failing to notify Black Hills of either the February 8 or March 3 incidents until it was served with the complaint, Black Hills argues the Commission, in the words of the ALJ, "was holding its aces up its sleeve" by unnecessarily allowing the daily fines to accrue. Assuming for purposes of argument only that the *ITT Cont'l Baking* dictum is a correct statement of the law, Black Hills has not established that the Commission's penalties were fundamentally unfair in this case.

[¶ 31] In its order, the Commission cogently explained:

The Commission has consistently taken the position that its computation of penalties was fair and reasonable and did not violate Black Hills' due process rights. Regarding the February 8, 2014 illegal dumping, the record indicates the Commission promptly started its investigation and took soil samples on February 11, 2014.... The Commission did not receive the results of the sample analysis until March 3, 2014.... Regarding the February 14, 2014 spill, the Commission's field technician witnessed the dumping of produced fluids and promptly investigated the illegal activity by acquiring a water sample from the actual truck. The Commission results of the lab analysis of the water, received on March 6, 2014, confirmed the fluid was produced water.... Finally, regarding the March 3, 2014 spill, the Commission had eyewitness reports that a Black Hills truck had dumped produced water—it would have been impossible to inform Black Hills of this violation during its February 28 meeting as implied by the ALJ. The Commission filed its complaint on March 13, 2014....

Although the Commission timely notified Black Hills of the February 14, 2014 illegal dumping witnessed by the Commission's field technician, Black Hills did nothing except interview its driver; it did not do any testing, it did not fire [the driver] or provide him with further training, it did not contact the Commission to discuss remediation or file a spill report, and it did not perform any remediation. Black Hills admits that other than the two meetings it had with the Commission, it had no other interaction with the agency. As testified by [Commission staff], that is unusual. Other trucking companies that have had spill

incidents have been proactive and contacted the Commission to determine what steps needed to be taken to remedy the violations.

The record indicates the Commission did not immediately notify Black Hills of the saltwater dumping because the Commission was actively investigating the matter and trying to identify the truck driver responsible for February 8, 2014 and March 3, 2014 incidents. As [Commission staff] testified, spill violators are difficult to catch and the claims are difficult to prove. Furthermore, it would be inappropriate for an agency to issue a formal notice of violation or complaint before finishing its investigation.

[¶ 32] We conclude the Commission's conduct did not violate basic notions of fundamental fairness.

### III

[¶ 33] It is unnecessary to address other arguments raised because they either are unnecessary to the decision or are without merit. We conclude the Commission regularly pursued its authority and its findings and conclusions are sustained by the law and by substantial and credible evidence. Because the Commission prevailed, Black Hills is not entitled to attorney fees under N.D.C.C. § 28–32–50(1). The judgment is affirmed.

[¶ 34] Carol Ronning Kapsner, S.J.

William A. Neumann, S.J.

Lisa Fair McEvers

Gerald W. VandeWalle, C.J.

[¶ 35] The Honorable William A. Neumann, S.J., sitting in place of Tufte, J., disqualified.

[¶ 36] The Honorable Jon J. Jensen was not a member of the Court when this case was heard and did not participate in this decision. Surrogate Judge Carol Ronning Kapsner, sitting.

Crothers, Justice, dissenting.

[¶ 37] I respectfully dissent.

[¶ 38] Black Hills Trucking ("BHT") argues the North Dakota Industrial Commission ("NDIC") lacks jurisdiction over the discharge of produced saltwater on a public road. The majority responds by discussing NDIC's general authority over petroleum well-site operations and disposal of oilfield wastes, including saltwater. *Majority opinion*, ¶¶ 12–19. But they do not examine the actual grounds on which NDIC seeks to impose nearly $1 million in penalties.

[¶ 39] Examination of the particular statutes and regulations relied upon by NDIC as a basis for the complaint in this case leads me to agree with BHT. I reach this conclusion because the NDIC's adjudicatory authority is not plenary, but instead is limited to that delegated by the legislature. *See Schwind v. Dir., N.D. Dept. of Transp.*, 462 N.W.2d 147, 150 (N.D. 1990) ("A public administrative body has such adjudicatory jurisdiction as is conferred on it by statute. The jurisdiction of an administrative agency is dependent upon the terms of the statute and must meet at least the basic mandatory provisions of the statute before jurisdiction is established." (citations omitted)). I believe the majority errs here because it confers on NDIC greater authority than was provided to NDIC in 2014 under the statutes and the administrative code. The majority also erroneously concludes the North Dakota Legislature did not give primary jurisdiction over the discharge of produced saltwater on a public road to the Department of Health, and the penalty imposed by NDIC violates the Constitution. I would reverse.

### A

[¶ 40] NDIC charged BHT with violations of N.D. Admin. Code § 43–02–03–19.2 (2013) for a February 8, 2014 fluid dump on a gravel road (Count One); for a February 14, 2014 fluid dump on a gravel road (Count Two); and for a March 3, 2014 incident leaving "two puddles and a trail of fluid" on an area adjacent to a gravel road (Count Three).

[¶ 41] NDIC relies on N.D. Admin. Code § 43–02–03–30.1 (2013) for a claim that the February 8, 2014 and February 14, 2014 incidents each were a "spill or leak" that unlawfully "allowed [fluid] to flow over, pool, or rest on the surface of the land or infiltrate the soil on the gravel road" (Counts Four and Five); for the March 3, 2014 incident where BHT allowed the "two puddles and a trail of fluid" "to flow over, pool, or rest on the surface of the land or infiltrate the soil on the gravel road" (Count Six); and for not properly removing the discharged fluids and allowing the fluids "to remain standing within or outside of diked areas" after the "discharged fluids were not properly removed from the gravel road" (Count Seven, Eight and Nine).

[¶ 42] Section 43–02–03–19.2, N.D. Admin. Code, relates to NDIC regulation of mineral exploration and development, oil and gas conservation, and is titled "disposal of waste material" and in 2014 provided in pertinent part:

"All waste material associated with exploration or production of oil and gas must be properly disposed of in an authorized facility in accordance with all applicable local, state, and federal laws and regulations.

"All waste material recovered from spills, leaks, and other such events shall immediately be disposed of in an authorized facility, although the remediation of such material may be allowed onsite if approved by the director."

[¶ 43] Section 43–02–03–30.1, N.D. Admin. Code, is titled "leak and spill cleanup" and in 2014 provided:

"At no time shall any spill or leak be allowed to flow over, pool, or rest on the surface of the land or infiltrate the soil. Discharged fluids must be properly removed and may not be allowed to remain standing within or outside of diked areas, although the remediation of such fluids may be allowed onsite if approved by the director. Operators must respond with appropriate resources to contain and clean up spills."

[¶ 44] I agree with the majority that NDIC has extensive power and authority to regulate oil and gas development in North Dakota. *Majority opinion*, ¶ 12. I also agree we have said NDIC's "powers are continuous ... and are exclusive." *Envtl. Driven Solutions, LLC v. Dunn Cty.*, 2017 ND 45, ¶ 9, 890 N.W.2d 841 (quoting *Egeland v. Cont'l Res., Inc.*, 2000 ND 169, ¶ 11, 616 N.W.2d 861). But the buzz words "continuous" and "exclusive" are being used here to supplant actual wording of the statute, where in *Dunn Cty.* the words were used in the context of comparing NDIC's legal authority to those of county government when approving the construction location of a waste oil processing facility. *Id.*

[¶ 45] The actual statute conferring NDIC's regulatory authority to act stated:

"The Commission has the authority:

* * * *

(2) To regulate:

(a) The drilling, producing, and plugging of wells, the restoration of drilling and production sites, and all other operations for the production of oil or gas.

(b) The shooting and chemical treatment of wells.

(c) The spacing of wells.

(d) Operations to increase ultimate recovery such as cycling of gas, the maintenance of pressure, and the introduction of gas, water, or other substances into producing formations.

(e) Disposal of saltwater and oilfield wastes.

(1) The commission shall give all affected counties written notice of hearings in such matters at least fifteen days before the hearing.

(2) The commission may consider, in addition to other authority granted under this section, safety of the location and road access to saltwater disposal wells, treating plants, and all associated facilities."

N.D.C.C. § 38–08–04(2) (2013). NDIC and the majority rely on words in subdivisions (2)(a) and (2)(e), and the majority proclaims NDIC's jurisdiction "clearly exists" under these provisions. *Majority opinion,* ¶ 18. I respectfully disagree.

[¶ 46] The words of this statute first state NDIC's jurisdiction is over "all other operations for the production of oil and gas." N.D.C.C. § 38–08–04(2)(a) (2013). BHT was not the well operator and it is not reasonable to conclude that the remote disposal of produced saltwater is "operations" by a non-operator for purposes of NDIC's regulatory authority. To rule otherwise would grant NDIC plenary jurisdiction over literally every person, piece of work, commerce, product and byproduct movement to or from a well, all under the guise of being part of "operations for the production of oil or gas." Such an expansive reading of the statute is not warranted by its plain words or by the context in which those words appear.

[¶ 47] Nor do I believe N.D.C.C. § 38–08–04(2)(e) (2013) provided NDIC authority to regulate the remote transportation or disposal of produced saltwater. That section was, at the time of events pertinent to this case, limited to "saltwater disposal wells, treating plants, and all associated facilities." *Id.* The statutory specification of "wells," "plants" and "facilities" is far less authority than the "cradle-to-grave jurisdiction over saltwater and oilfield waste" repeatedly claimed by NDIC in its filings with this Court. Rather, the words of the statute make plain that NDIC's jurisdiction related to "wells," "treating plants" and "associated facilities." *Id.* I do not agree public roads could fairly be described as any of these three things.

[¶ 48] NDIC next argued and the majority agreed that N.D. Admin. Code § 43–02–03–30.1 (2013) applied to more than "operators." *Majority opinion,* ¶¶ 15–17. At the time of events in this case, the regulation applied to "operators." *See* ¶ 10, above. The regulation was amended in 2015, after events in this matter, to state: "Operators and responsible parties must respond [to any spill or leak] with appropriate resources to contain and clean up spills." N.D. Admin. Code § 43–02–03–30.1 (2015). The majority characterizes the addition of the words "and responsible parties" as a clarification rather than a substantive claim. *Majority opinion,* ¶ 16. They then build on the "clarification" to conclude others who are not operators are responsible for spill or leak clean up. *Id.*

[¶ 49] I again respectfully disagree with the majority. While clean up obligations now exist for operators and others, nothing in the prior plain language allowed for such a conclusion. Rather, the prior statute limited clean up obligations to "operators," and BHT was not an operator. We must accept this clear statement of law from the face of the statute. *See Estate of Christe-*

*son v. Gilstad*, 2013 ND 50, ¶ 12, 829 N.W.2d 453 ("When engaging in statutory interpretation, this Court has consistently recognized that it must be presumed the legislature intended all that it said, said all that it intended to say, and meant what it has plainly expressed."). Therefore, I do not believe the law gave NDIC legal authority to seek the relief sought against BHT in Counts 1–3 of the complaint.

**B**

[¶ 50] The majority next accepts NDIC's argument that its assertion of jurisdiction over remote disposal of saltwater was not an unlawful encroachment on the North Dakota Department of Health's ("DOH") primary jurisdiction. Again, I do not agree.

[¶ 51] The legislature established a regulatory scheme granting NDIC authority over produced saltwater when it is generated and stored at well sites, and when it is disposed of at a facility. *See* N.D.C.C. § 38–08–04(2)(a), (2)(e) (2013). At the same time, the legislature expressly provided DOH with jurisdiction over the transportation of produced saltwater. *See* N.D.C.C. § 23–29–03(14) (2013) ("'Solid waste' means ... discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations"), 23–29–02 (2013) (declaring the regulation of solid waste transportation to be one of the purposes of N.D.C.C. ch. 23–29); N.D. Admin. Code § 33–20–01.1–04(3) (2013) (requiring solid waste to be transported "in a manner that provides for public safety, [and] prevents uncontrolled introduction into the environment").

[¶ 52] BHT was transporting produced saltwater over public highways. Produced saltwater is a solid waste under North Dakota law. N.D.C.C. § 23–29–03(14) (2013). DOH has specific and comprehensive authority over transportation of solid waste, which vests DOH with clear and direct (i.e. primary) jurisdiction in this matter.

[¶ 53] The primary jurisdiction doctrine generally applies when an agency's jurisdiction overlaps with a court's jurisdiction. This Court has expressed disapproval of bifurcated legal proceedings that "create duplication, and uncertainty, and waste manpower and money, with no appreciable result, and all without improving the administration of justice." *Shark Bros., Inc. v. Cass Cty.*, 256 N.W.2d 701, 705 (N.D. 1977); *see Amerada Hess Corp. v. Conrad*, 410 N.W.2d 124, 126 n.1 (N.D. 1987); *City of Minot v. Central Ave. News, Inc.*, 325 N.W.2d 243, 243 (N.D. 1982) (illustrating "the evils that flow from thoughtless bifurcation or trifurcation of actions").

[¶ 54] In the exercise of its regulatory jurisdiction over hauling produced water, DOH cited BHT with multiple violations relating to the spills, including:

- That BHT hauled solid waste (produced saltwater) without a valid waste transporter's permit issued by DOH;
- That BHT unlawfully abandoned solid waste on a street or highway;
- That BHT deposited solid wastes where they may cause pollution of the state's waters;
- That BHT did not report spills of solid waste to DOH.

In response to DOH's Notice of Violations, BHT entered an Administrative Consent Agreement where it "[did] not dispute the findings in the Department's Notice of Violation." BHT agreed to pay a $459,000 administrative penalty, with $259,000 suspended on certain conditions. Among the conditions were that BHT would train its drivers on legal requirements regarding spills and that BHT would not apply for a "Waste Transporter Permit" for five years.

During the five year period, BHT could apply to the DOH for a "probationary Waste Transporter Permit" which would be subject to "any conditions reasonably related to environmental protection, such as conditions requiring such waste tracking and equipment to prevent such waste leaking from trucks."

[¶ 55] In view of the regulatory system in place at the time of the spills, I agree with BHT that the logic underlying our prior applications of the primary jurisdiction doctrine should inform us in this case. Here, NDIC imposed daily $12,500 fines totaling $875,000 for alleged failures to properly remove discharged fluids. At the same time, DOH's Consent Agreement covered the same spills, imposed a substantial fine, and imposed regulatory sanctions directly related to transportation of produced saltwater. It also should not be lost on us that DOH—the Department with clear authority over transportation of waste—required no remediation or reclamation. BHT contacted both the county and the township with jurisdiction over the roads and neither required nor requested any remediation or reclamation. By contrast, NDIC seeks to impose fines totaling $875,000 for BHT's failure to remediate, yet NDIC has not and cannot articulate what environmental harms resulted from the spills or what efforts would be needed to address them. When asked to identify any environmental consequence resulting from the spills, NDIC's representative testified, "I believe there is probably some. I don't have the evidence, though." And, while NDIC's order criticizes and fines BHT for failing to remediate the spills, the order never specifies what remediation efforts could have or should have been performed, and concedes that any harms arising from the spills "may not be readily quantifiable."

[¶ 56] In view of clear law vesting DOH with jurisdiction over transportation of solid waste, and in view of NDIC's at best questionable jurisdiction over produced saltwater that is moved away from a well site and that is not at a facility, I would conclude NDIC has impermissibly interfered with DOH's primary jurisdiction in this matter. As a result, NDIC cannot lawfully assert or prosecute any of the claims in the complaint.

C

[¶ 57] The final issue upon which I part company with the majority relates to whether the amount of NDIC's fine was constitutionally suspect. BHT argues the fine was unconstitutionally excessive and due process was violated when NDIC sought to impose daily fines for lack of remediation, yet did not give BHT notice of violation or ever demand remediation. The Administrative Law Judge ("ALJ"), Patrick Ward, addressed these issues. NDIC rejected ALJ Ward's recommendation. I agree with ALJ Ward and incorporate the relevant portion of his decision below.

"Administrative proceedings must not violate the due process rights of the parties appearing, and must conform to '[b]asic notions of fundamental fairness.' *Morrell v. North Dakota Dep't of Transp.*, 1999 ND 140, ¶ 9, 598 N.W.2d 111. Published cases in North Dakota dealing with due process in administrative hearings have generally focused on the minimum requirements of procedural due process: notice and a meaningful opportunity for a hearing. *E.g., Schlittenhart v. North Dakota Dep't of Transp.*, 2015 ND 179, ¶ 27, 865 N.W.2d 825. However, the North Dakota Supreme Court has also recognized that the concepts of due process and fairness 'are flexible and must be analyzed on a case-by-case basis.' *Wahl v. Morton Cty.*

*Soc. Servs.*, 1998 ND 48, ¶ 6, 574 N.W.2d 859.

"Federal courts have recognized that when a party is potentially liable for penalties that accrue daily, an administrative agency has an obligation to notify a party of a violation at the time the agency acquires knowledge of that violation: 'it would seem unreasonable to permit the commission to knowingly let daily penalties accrue without giving notice of the commission's position at the earliest reasonable time.' [ *United States v. ITT Cont'l Baking Co.*, No. C-1220, slip op. at 5, 1971 WL 596 (D. Colo. Aug. 2, 1971), *dismissal denied*, 462 F.2d 1104 (10th Cir. 1972).] The district court's opinion labeled this statement as 'obiter dictum,' because the court also held that the Federal Trade Commission could not levy daily accruing penalties against the defendant. The district court's ruling on daily-accruing penalties was upheld by the Tenth Circuit, but overruled by the United States Supreme Court. *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 243, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975). The Supreme Court took note of the district court's comments on the agency's need to give notice, but explicitly declined to rule on the issue. *Id.* at 226 n.2, 95 S.Ct. 926.

"The Second Circuit subsequently expressed broad agreement with the idea that an agency cannot knowingly allow daily penalties to accrue without providing notice of the violation, but noted that it was difficult for a reviewing court 'unacquainted with the Commission's workload' to determine what constituted reasonably timely notice. *United States v. J[.]B. Williams Co.*, 498 F.2d 414, 435 (2d Cir. 1974).

"The rule proposed by the federal district court in *ITT Cont'l Baking* is sound and should be adopted in this case. Here, the Commission met with representatives of Black Hills after the February 8 and February 14 incidents; those representatives informed Commission staff that, based on their conversations with Leo Slemin, they believed that the February 14 incident was a one-time event. Commission staff failed to notify Black Hills of the February 8 incident at this meeting, and failed to notify Black Hills at that time of either the February 8 incident or the subsequent March 3 incident until it served Black Hills with the Complaint. The Commission had knowledge of what it believed were violations that it could use as a basis to pursue daily $12,500 fines, knew that Black Hills was not aware of two of the three alleged incidents, and still failed to notify Black Hills of the incidents or order immediate remediation. The Commission's conduct in this case violates basic notions of fundamental fairness, and this is another reason the Commission should refrain from imposing the daily-accruing penalties it seeks in Count Seven (for the alleged February 8 incident) and Count Nine (for the alleged March 3 incident).

"The actions of Mr. Slemin, the Black Hills[ ] driver, were deliberate and intentional, against the law, and clearly not consistent with company policy, based on testimony of the various company witnesses who participated in the hearing. Given that fact, it is difficult to see how BHT could have taken remedial action or even been aware of Slemin's conduct without advice from someone who knew what he was doing. It is fundamentally unfair for the Commission to now slam BHT with the maximum allowable fine as a punitive and deterrent measure for incidents in which it was holding its aces up its sleeve during its meeting with BHT. If any daily penalties are allowed to accrue in this case,

they should be reasonably related to the gravity of the offense and the knowledge or scienter of BHT."

[¶ 58] I agree with ALJ Ward that NDIC's fines are both punitive and excessive because the fines bear no relationship to the damage caused or the cost of remediation or reclamation. As indicated above, NDIC could not identify environmental harm resulting from the spills, and neither it nor any other governmental body ever requested much less ordered any work at the sites. The fines therefore are aimed at punishing BHT and warning others that they will be treated harshly for similar misconduct. While punishment might otherwise be an option if NDIC had jurisdiction over the violation, the actual punishment meted out must comport with both due process and the excessive fines clause. Here, the facts demonstrate that NDIC complied with neither, and the fines sought in Counts 7, 8 and 9 of the complaint should have been barred by the Constitution.

[¶ 59] Daniel J. Crothers