# IN THE SUPREME COURT
# STATE OF NORTH DAKOTA

## 2024 ND 183

| | |
|---|---|
| Liberty Petroleum Corporation, | Appellant |
| v. | |
| North Dakota Industrial Commission,<br>and Burlington Resources Oil & Gas Co. LP, | Appellees |
| and | |
| Continental Resources, Inc., and<br>XTO Energy, Inc., | Respondents |

## No. 20240022

Appeal from the District Court of McKenzie County, Northwest Judicial District, the Honorable Robin A. Schmidt, Judge.

AFFIRMED.

Opinion of the Court by McEvers, Justice.

Joshua A. Swanson, Fargo, ND, for appellant.

David P. Garner, Bismarck, ND, for appellee North Dakota Industrial Commission.

Wade C. Mann (argued) and Zachary R. Eiken (appeared), Bismarck, ND, for appellee Burlington Resources Oil & Gas Co. LP.

**McEvers, Justice.**

[¶1] Liberty Petroleum Corporation ("Liberty") appeals from a judgment affirming North Dakota Industrial Commission ("NDIC") orders approving a plan of unitization. We affirm, concluding NDIC did not exceed its authority, misapply the law, or authorize an unconstitutional taking; and made findings and conclusions sustained by the law and by substantial and credible evidence.

I

[¶2] In January 2022, Burlington Resources Oil & Gas Co. LP ("Burlington") petitioned NDIC in Case No. 29224 for an order providing for the unitized management, operation, and further development of the Haystack Butte (Bakken Pool) Unit ("HBU"), located in McKenzie County, North Dakota; approving the plan of unitization for the HBU; and vacating applicable spacing orders. Burlington alleged "[u]nitization will allow wells to be drilled without regard to the spacing unit boundaries that would otherwise restrict the length and location of horizontal wellbores." Along with its petition, Burlington submitted a proposed unit agreement and a proposed unit operating agreement. Burlington filed a second petition in Case No. 29225 seeking an order from NDIC finding the plan of unitization was approved by lessees and royalty owners owning the required percentage of working interest and royalty interest within the HBU.

[¶3] Liberty objected to the petitions. Liberty holds federal oil and gas leases and owns working interests in the HBU. Prior to petitioning, the HBU consisted of multiple spacing units. Burlington and Continental Resources, Inc. ("Continental") operated 19 wells on these spacing units. Liberty's working interests were in six of the spacing units, which is where 11 of the wells were drilled. Liberty elected to participate in seven of the wells, and declined to participate in four of the wells (the "non-consent wells"). Three of the four non-consent wells were located in spacing units that had additional wells in which Liberty elected to participate. Because Liberty declined to participate in the non-consent wells, it did not pay for its reasonable actual share of costs for drilling

and operating the non-consent wells. Under N.D.C.C. § 38-08-08(3)(a), Liberty was assessed a risk penalty equal to 200% of its share of the costs of drilling the well, which "may be recovered out of, and only out of, production from the pooled spacing unit." At the time of the petitions, Liberty had an outstanding payout balance for the non-consent wells.

[¶4] The proposed unit operating agreement provided for how outstanding payout balances on non-consent wells committed to the HBU would be paid off. Article 11.8 stated that a working interest owner's pre-unitization payout balance shall be "satisfied out of proceeds from the sale of Unitized Substances attributable to the affected Tract." Liberty objected to Article 11.8, arguing it would "unfairly and inequitably" take revenue from the wells it elected to participate in to satisfy the penalty balances on the non-consent wells. Liberty requested Article 11.8 "be modified to provide that only revenue attributable to each non-consent well on a tract be used to pay off the existing non-consent penalties."

[¶5] In March 2022, NDIC held a hearing on the petitions. Three of Burlington's experts testified at the hearing; both Burlington and Liberty were represented by counsel. In June 2022, NDIC issued Order No. 31792 in Case No. 29224 approving the unit agreement and unit operating agreement (together, "plan of unitization"), including Article 11.8. NDIC found that the plan for unitization is in the public interest, protective of correlative rights, and reasonably necessary to increase the ultimate recovery of oil and gas and prevent waste. NDIC rejected Liberty's arguments against Article 11.8, concluding that "[p]roduction from the wells in the Unit area is no longer distributed on a spacing unit basis, it is distributed to each 'tract' within the Unit area regardless of where it was produced." In December 2022, NDIC issued Order No. 31793 in Case No. 29225 finding the necessary approvals from owners in the HBU had been provided and ordering the plan of unitization to be effective on January 1, 2023. On January 6, 2023, Liberty appealed the two NDIC orders to the district court. The court affirmed the orders and entered judgment dismissing the appeal.

2

[¶6]   Our review of NDIC orders is "very limited." *Black Hills Trucking, Inc. v. N.D. Indus. Comm'n*, 2017 ND 284, ¶ 10, 904 N.W.2d 326.

> The standard of judicial review of Commission orders is set forth in N.D.C.C. § 38-08-14(3), which provides that "[o]rders of the commission must be sustained by the district court if the commission has regularly pursued its authority and its findings and conclusions are sustained by the law and by substantial and credible evidence." This Court applies the same standard of review in appeals from district court involving orders of the Commission. *See Amoco Prod. Co. v. North Dakota Indus. Comm'n*, 307 N.W.2d 839, 842 (N.D. 1981). The "substantial evidence" test "is something less" than the greater weight of the evidence and the preponderance of the evidence tests, and differs from the usual standard of review for administrative decisions under N.D.C.C. § 28-32-46. *Hanson v. Industrial Comm'n*, 466 N.W.2d 587, 590 (N.D. 1991). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and we "accord greater deference to Industrial Commission findings of fact than we ordinarily accord to other administrative agencies' findings of fact." *Id.* The Commission's decisions on questions of law are fully reviewable on appeal. *See Imperial Oil of North Dakota, Inc. v. Industrial Comm'n*, 406 N.W.2d 700, 702 (N.D. 1987).

*Black Hills*, at ¶ 10.

[¶7]   This Court has said that "we generally defer to an administrative agency's reasonable interpretation of its governing statutes and rules." *Black Hills*, 2017 ND 284, ¶ 19. The United States Supreme Court recently held that "courts need not and under the [federal Administrative Procedure Act] may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024). This case does not involve the interpretation of a federal statute under the federal Administrative Procedure Act. Nor have the parties argued the statutes involved in this case are ambiguous. Because we conclude that the relevant statutes are unambiguous in this context, we need not reevaluate our precedent in light of *Loper Bright*.

[¶8] Liberty argues NDIC exceeded its authority and misapplied the law by approving Article 11.8 of the unit operating agreement, which authorizes payment of pre-unitization risk penalty balances out of the share of unit production and revenues allocated to its working interests in four tracts of the HBU in violation of N.D.C.C. § 38-08-08(3). Under N.D.C.C. § 38-08-08(3)(a), the risk penalty is recovered out of the production from the pooled spacing unit:

> In addition to any costs and charges recoverable under subsections 1 and 2, if the owner of an interest in a spacing unit elects not to participate in the risk and cost of drilling a well thereon, the owner paying for the nonparticipating owner's share of the drilling and operation of a well may recover from the nonparticipating owner a risk penalty for the risk involved in drilling the well. The recovery of a risk penalty is as follows:
>
> > a. If the nonparticipating owner's interest in the spacing unit is derived from a lease or other contract for development, the risk penalty is two hundred percent of the nonparticipating owner's share of the *reasonable actual costs of drilling and completing the well* and may be recovered out of, and only out of, *production from the pooled spacing unit*, as provided by section 38-08-10, exclusive of any royalty or overriding royalty.

(Emphasis added.) *See also Gadeco, LLC v. Indus. Comm'n*, 2012 ND 33, ¶¶ 4-6, 812 N.W.2d 405 (discussing purpose and history of risk penalties under N.D.C.C. § 38-08-08).

[¶9] NDIC and Burlington argue the creation of the HBU under unitization, and termination of the spacing units, means N.D.C.C. § 38-08-09.4 governs the collection of risk penalties. Under N.D.C.C. § 38-08-09.4(3)(a), the risk penalty is recovered out of the production from the unit:

> Upon and subject to such terms and conditions as to time and legal rate of interest as may be fair to all concerned, reasonable provision must be made in the plan of unitization for carrying or otherwise financing owners who are unable to promptly meet their financial

obligations in connection with the unit and, in addition to the unit expense assessed against each tract and chargeable to each owner, the recovery of a risk penalty from each owner electing not to participate in the unit expense. The recovery of the risk penalty is as follows:

> a. If the nonparticipating owner's interest in the unit is derived from a lease or other contract for development, the risk penalty is two hundred percent of the nonparticipating owner's share of the *unit expense* and may be recovered out of, and only out of, *production from the unit*, exclusive of any royalty or overriding royalty.

(Emphasis added.) *See also Petro-Hunt, L.L.C. v. Tank*, 2024 ND 46, ¶¶ 28-30, 4 N.W.3d 526 (recognizing the different statutory procedures between pooling of a spacing unit and unitization); *Fisher v. Cont'l Res., Inc.*, 49 F. Supp. 3d 637, 641-42, 644 (D.N.D. 2014) (discussing unitization). "'Unit expense' includes and means any and all cost and expense in the conduct and management of its affairs or the operations carried on by it." N.D.C.C. § 38-08-09.13(4).

[¶10] Article 11.8 of the unit operating agreement provides,

> Any interest for which the interest owner elected (or is deemed to have elected) to not participate in a proposed operation and for which as of the Effective Date of the Unit or any time thereafter that proposed operation has not reached payout (including, without limitation, any interest subject to penalty provisions of a Commission force pooling order) (such interest, a "Non-Consenting Interest"), shall be considered a Non-Consenting Interest until the payout balance has been satisfied out of proceeds from the sale of Unitized Substances *attributable to the affected Tract*. The consenting owners who are carrying the Non-Consenting Interest in the Tract shall be deemed to be owners of the Non-Consenting Interest in the Tract ("Carrying Owner") until the payout balance has been reduced to zero.

(Emphasis added.)

[¶11] Neither statute explicitly states where the risk penalty is to be taken from when it accrued during the life of the spacing unit, and the spacing unit is

subsequently terminated and a unitized area is created under unitization. Under N.D.C.C. § 38-08-09.4(3)(a), governing unitization, "the risk penalty is two hundred percent of the nonparticipating owner's share of the unit expense." Unit expense was given a broad definition by the Legislature to include and mean "any and all cost and expense in the conduct and management of its affairs or the operations carried on by it." N.D.C.C. § 38-08-09.13(4). Pre-unitization costs of drilling and operating a well, which is now attributed to the unit, reasonably fall within the definition of unit expense. Effective January 1, 2023, the spacing units within the HBU were terminated and the unitized area is what remains. Under unitization, the risk penalty "may be recovered out of, and only out of, production from the unit." N.D.C.C. § 38-08-09.4(3)(a). Consistent with the unitization statutes, Article 11.8 allows payout balances to be satisfied out of proceeds from the sale of unitized substances attributable to the affected tract.

[¶12] Even under N.D.C.C. § 38-08-08, Liberty's argument fails. The plain language of N.D.C.C. § 38-08-08(3)(a) states "the risk penalty is two hundred percent of the nonparticipating owner's share of the reasonable actual costs of drilling and completing the well and may be recovered out of, and only out of, production from the *pooled spacing unit*." (Emphasis added.) This statute does not state, as Liberty contends, that the risk penalty must be recovered out of production from the specific non-consent well. Rather, it is recovered from the pooled spacing unit. This language is consistent with Article 11.8, which allows payout balances to be satisfied out of proceeds from the sale of unitized substances attributable to the affected tract.

[¶13] Liberty cites extensively from a prior NDIC order, Order No. 32353 in Case No. 29746 ("Twin City Technical Case"), in arguing risk penalties on non-consent wells can only come out of that specific well's production. Because the Twin City Technical Case concerned risk penalties on non-consent wells solely under a spacing unit pursuant to N.D.C.C. § 38-08-08(3), not after unitization, the case is distinguishable from this case. Further, because we conclude N.D.C.C. § 38-08-08(3)(a) unambiguously allows for recovery of the risk penalty out of production from the pooled spacing unit, we do not defer to the agency's interpretation of the statute. N.D.C.C. § 1-02-05 ("When the wording of a statute is clear and free of all ambiguity, the letter of it is not to be disregarded under the pretext of

pursuing its spirit."); *Pub. Serv. Comm'n v. Wimbledon Grain Co.*, 2003 ND 104, ¶ 28, 663 N.W.2d 186 ("Because the challenged statutes are unambiguous, we give no deference to the Commission's interpretation of them.").

[¶14] NDIC is "vested with continuing jurisdiction, power, and authority, including the right to describe and set forth in its orders all those things pertaining to the plan of unitization which are fair, reasonable, and equitable and which are necessary or proper to protect, safeguard, and adjust the respective rights and obligations of the several persons affected, and it is its duty to make and enforce such orders and do such things as may be necessary or proper to carry out and effectuate the purposes of sections 38-08-09.1 through 38-08-09.16." N.D.C.C. § 38-08-09.2. We conclude NDIC did not err in applying the unitization statutes and approving the unit operating agreement, including Article 11.8. Therefore, NDIC has regularly pursued its authority and did not misapply the law.

IV

[¶15] Liberty argues NDIC's approval of Article 11.8 is an unconstitutional taking. Liberty contends that by approving Article 11.8, NDIC "confiscated Liberty's ownership interests in four tracts of the HBU," violating the takings clauses of the federal and state constitutions.

[¶16] The Fifth Amendment guarantees that private property shall not "be taken for public use, without just compensation." U.S. Const. Amend. V. The North Dakota Constitution states that "[p]rivate property shall not be taken or damaged for public use without just compensation having been first made to, or paid into court for the owner." N.D. Const. art. I, § 16. "Whether there has been a taking of private property for public use is a question of law." *Wilkinson v. Bd. of Univ. & Sch. Lands*, 2017 ND 231, ¶ 22, 903 N.W.2d 51.

[¶17] "There are two categories of regulatory action considered per se takings: physical takings and total regulatory takings." *Wilkinson v. Bd. of Univ. & Sch. Lands*, 2022 ND 183, ¶ 25, 981 N.W.2d 853. "A physical taking is where the government requires an owner to suffer a permanent physical invasion of her property." *Id.* (quotations omitted). "Total regulatory takings occur when

7

regulations completely deprive an owner of all economically beneficial use of her property." *Id.* (cleaned up). Liberty argues that NDIC committed either a physical or total regulatory taking because its working interests have been impermissibly transferred to the carrying owners, Burlington and Continental, depriving it of its exclusive use and possession of the tracts' share of the HBU production.

[¶18] Liberty has not argued that the unitization statutes (N.D.C.C. §§ 38-08-09.1 through 38-08-09.16) are unconstitutional on their face, but rather that NDIC authorized an unconstitutional taking by approving Article 11.8. Article 11.8 does not cause Liberty to "suffer a permanent physical invasion of [its] property." *Wilkinson*, 2022 ND 183, ¶ 25; *Cf. Nw. Landowners Ass'n v. State*, 2022 ND 150, ¶ 26, 978 N.W.2d 679 (concluding the state committed per se taking by allowing third-party operators to "physically invade a landowner's property by injecting substances into the landowner's pore space"). Nor does Article 11.8 "completely deprive" Liberty of "all economically beneficial use" of its working interests. *Wilkinson*, at ¶ 25 (emphasis omitted). We agree with Burlington that "Liberty continues to own its working interests, and Liberty continues to be credited with its share of production while that production pays down Liberty's payout balance. This is not a situation where Liberty is not receiving any economic benefit for its interest—rather, this is a situation where Liberty is receiving a different economic benefit than what it would prefer."

[¶19] NDIC and Burlington argue NDIC's actions are a permissible exercise of the state's police powers. "Property is subject to the police power of the state to impose such restrictions upon private rights as are practically necessary for the general welfare of all." *Cont'l Res., Inc. v. Farrar Oil Co.*, 1997 ND 31, ¶ 15, 559 N.W.2d 841 (quotations omitted). "The Act for the Control of Gas and Oil Resources, N.D.C.C. ch. 38-08, grants the Commission comprehensive powers to regulate oil and gas development in the state, and this Court has upheld as valid exercises of the state's police powers various Commission orders spacing or compelling pooling." *Egeland v. Cont'l Res., Inc.*, 2000 ND 169, ¶ 11, 616 N.W.2d 861. "Since force-pooled oil and gas operations are deemed, for all purposes, to be the proper conduct of such operations upon each separately owned tract in the drilling unit by the several owners thereof under N.D.C.C. § 38-08-08(1) of

8

the Resources Act, the property law of trespass does not affect those authorized operations and, to that extent, property law is necessarily superseded." *Farrar Oil*, at ¶ 17 (cleaned up). "To hold otherwise . . . would frustrate the purposes of the North Dakota Resources Act and would make an Industrial Commission's forced pooling order ineffectual." *Id.* We conclude that NDIC lawfully exercised the police powers of this state, utilizing the unitization statutes in creating a unitized area, and the orders approving the plan of unitization do not authorize an unconstitutional taking.

V

[¶20] Liberty argues NDIC failed to make findings supported by substantial and credible evidence. Liberty asserts NDIC failed to explain how the plan of unitization, and Article 11.8 specifically, contains fair, reasonable, and equitable provisions "for the division of interest or formula for the apportionment of HBU production among the tracts within the Unit area" and "to protect, safeguard and adjust the rights and obligations of all affected persons." Liberty further contends NDIC failed to explain how approval of Article 11.8 (1) was in the public interest and reasonably necessary to increase ultimate recovery, prevent waste, and protect correlative rights; (2) complied with the requirements of N.D.C.C. §§ 38-08-09.1 to 38-08-09.16; and (3) was for the common good, resulting in the general advantage of all owners of the oil and gas rights within the common source of supply.

[¶21] Liberty fails to provide any legal authority requiring these specific findings with respect to Article 11.8, concerning the non-consent interests. Under N.D.C.C. § 38-08-09.3, NDIC must make a series of findings regarding the plan of unitization as a whole, which includes in part, finding that unitization is "feasible, will prevent waste, and will with reasonable probability result in the increased recovery of substantially more oil and gas from the common source of supply than would otherwise be recovered" and "is for the common good and will result in the general advantage of the owners of the oil and gas rights within the common source of supply." N.D.C.C. § 38-08-09.3(2), (4). NDIC must also find that "the estimated additional cost, if any, of conducting such operations will not exceed the value of the additional oil and gas so recovered." N.D.C.C. §

38-08-09.3(3). Additionally, NDIC must order that unitization occur "upon such terms and conditions, as may be shown by the evidence to be fair, reasonable, equitable, and which are necessary or proper to protect, safeguard, and adjust the respective rights and obligations of the several persons affected." N.D.C.C. § 38-08-09.3.

[¶22] Section 38-08-09.4, N.D.C.C., provides in relevant part:

[The] plan of unitization must contain fair, reasonable, and equitable provisions for:

1. The efficient unitized management or control of the further development and operation of the unit area for the recovery of oil and gas from the common source of supply affected. . . .

2. The division of interest or formula for the apportionment and allocation of the unit production, among and to the several separately owned tracts within the unit area such as will reasonably permit persons otherwise entitled to share in or benefit by the production from such separately owned tracts to produce or receive, in lieu thereof, their fair, equitable, and reasonable share of the unit production or other benefits thereof. . . .

3. The manner in which the unit and the further development and operation of the unit area shall or may be financed and the basis, terms, and conditions on which the cost and expense thereof shall be apportioned among and assessed against the tracts and interests made chargeable therewith, including a detailed accounting procedure governing all charges and credits incident to such operations. Upon and subject to such terms and conditions as to time and legal rate of interest as may be fair to all concerned, reasonable provision must be made in the plan of unitization for carrying or otherwise financing owners who are unable to promptly meet their financial obligations in connection with the unit and, in addition to the unit expense assessed against each tract and chargeable to each owner, the recovery of a risk penalty from each owner electing not to participate in the unit expense.

10

[¶23] NDIC made the required findings under N.D.C.C. § 38-08-09.3, finding:

(22) The unitization and unitized operation of the common source of supply . . . is fair, reasonable, equitable, and is necessary to protect, safeguard, and adjust the respective rights and obligations of the several persons affected including royalty owners, owners of overriding royalties, oil and gas payments, carried interests, mortgagees, lien claimants, and others, as well as the lessees.

(23) The unitized management, operation, and further development of a common source of supply of oil and gas or portion thereof is reasonably necessary in order to effectively develop the common source of supply. . . .

(24) One or more unitized methods of operation as applied to such common source of supply or portion thereof are feasible, will prevent waste and will with reasonable probability result in the increased recovery of substantially more oil and gas from the common source of supply than would otherwise be recovered.

(25) The estimated additional cost of conducting such operations will not exceed the value of the additional oil and gas so recovered.

. . . .

(37) Such unitization and the adoption of the proposed method of operation is for the common good and will result in the general advantage of the owners of the oil and gas rights within the common source of supply or portions thereof directly affected.

[¶24] Consistent with N.D.C.C. § 38-08-09.4, NDIC ordered:

The Plan of Unitization, as herein amended, contains fair, reasonable, and equitable provisions for:

(a) The efficient, unitized management and control of the further development and operation of the Unit area for the recovery of oil and gas from the common source of supply affected.

11

(b) The division of interest or formula for the apportionment and allocation of the Unit product among the tracts within the Unit area is fair, equitable and reasonable.

(c) The manner in which the Unit and the further development and operation of the Unit area shall or may be financed and the basis, terms and conditions upon which cost and expense thereof shall be apportioned among and assessed against the tracts and interest made chargeable therewith, including a detailed accounting procedure governing all charges and credits incident to such operation, and makes reasonable provision for carrying or otherwise financing lessees who are unable to promptly meet their financial obligations in connection with the Unit, including the recovery of a risk penalty imposed upon working interest owners that elect not to participate in the Unit expense.

[¶25] NDIC found the plan for unitization is in the public interest, protective of correlative rights, and reasonably necessary to increase the ultimate recovery of oil and gas and prevent waste. NDIC found the two-phase allocation formula compensating owners for production protects correlative rights. Supporting these findings, NDIC highlighted testimony from Burlington's experts, including testimony concerning the best- and worst-case scenarios if the area is not unitized:

Burlington acknowledged in a best-case scenario, the development of the lands within the proposed area to be unitized on a spacing unit basis (non-unitized) would include the same number of horizontal wells but they would be impacted by the spacing unit setbacks resulting in shorter lateral lengths and an 827,000-barrel reduction in remaining estimated ultimate recovery. In a worst-case scenario if the area is not unitized and it is unable to develop some of the spacing units from surface locations outside the respective spacing unit, Burlington testified that would prevent 48 horizontal wells from being drilled.

Burlington's expert testified that approval of Article 11.8 is in the best interest of all of the working interest owners, as opposed to a single owner who wants the risk penalty to be well-specific. Liberty presented no evidence, through

12

testimony or otherwise, challenging Burlington's expert's opinion, whose testimony supports NDIC's findings.

[¶26] Under our deferential standard of review, we "accord greater deference to Industrial Commission findings of fact than we ordinarily accord to other administrative agencies' findings of fact." *Black Hills*, 2017 ND 284, ¶ 10. We conclude NDIC made the required findings, and those findings are supported by substantial and credible evidence.

## VI

[¶27] We have considered the remaining arguments and conclude they are either unnecessary to our decision or without merit. The judgment is affirmed.

[¶28] Jon J. Jensen, C.J.
Daniel J. Crothers
Lisa Fair McEvers
Jerod E. Tufte
Douglas A. Bahr